## LEE v. CONGRESS BEAUTY EQUIPMENT CO.
### No. 928.

District Court, D. Massachusetts.

Jan. 5, 1943.

Harrison F. Lyman and Charles E. Hammett, Jr., both of Boston, Mass. (Fish, Richardson & Neave, of Boston, Mass., of counsel), for plaintiff.

Robert J. Keating, of Boston, Mass. (Roberts, Cushman & Woodberry and Samuel J. Weiner, all of Boston, Mass., and Maurice S. Cayne, of Chicago, Ill., of counsel), for defendant.

WYZANSKI, District Judge.

### Findings of Fact.

#### A. Nature of the Case.

1. This is a suit for infringement of Reed patent No. 1,978,388 for a heat producing composition and method of chemically generating heat. Claims 1, 2, 3, 5, 7, 8 and 10 are in suit.

2. Plaintiff is the assignee of the patent. Defendant is the seller of certain hair waving pads known as "Windsor" and "Park Avenue" pads. For the purposes of this case there is no difference between the "Windsor" and "Park Avenue" pads.

#### B. General Description of the Reed Patent.

3. The Reed invention relates to a composition and a method for generating heat by chemical reactions, particularly by chemical action of the composition with water. It is not in terms limited to body warming pads. The principal objects of the invention are (a) to provide a composition of the type referred to which has greater heat generating capacity than has heretofore been obtainable with the compositions in use, and also (b) to provide a composition which will remain stable over long periods of time.

4. The patent recites that the chemical heat producing combinations theretofore used "usually comprise a mixture of a metal and one or more electrolytes, the metal commonly used being iron, and the electrolyte usually comprising some type of salt, the metallic ion of which is electrolytically replaceable by iron. In some cases the mixtures used also include an oxidizing agent such as manganese dioxide, or the like".

5. The patentee says he has "found that the addition to a heating mixture or composition of the type referred to, of a second metal, which is above the base metal in the electromotive series of metals, will result in the production of greater quantities of heat than has heretofore been possible." Other advantages asserted are "the proportion of replaceable electrolyte in the mixture may be substantially reduced without apparent decrease in the amount of heat involved"; "electrolytes having quite limited solubility in water may be used in lieu of very soluble electrolytes"; "non-replaceable electrolytes * * * may be used in lieu of the replaceable electrolytes"; "the class of electrolytes available need not be confined to those which are replaceable by the base metal"; and "the initial peak temperature may be controlled quite accurately by regulating the proportion of the second metal used in the mixture."

6. The patent cites iron as a usual base metal in these compositions, and refers to aluminum as a satisfactory second metal. It gives formulae which involve iron and aluminum with a replaceable electrolyte such as cupric chloride or lead chloride, *or* with a non-replaceable electrolyte such as potassium chloride. But it asserts that the patentee found the preferred mixture to comprise: [base metal] iron filings, 600 grams; [second metal higher in the electromotive series] powdered aluminum, 2 grams; [replaceable electrolyte] lead chloride, 10 grams; and [non-replaceable electrolyte] potassium chloride, 5 grams.

7. As to the proportions of aluminum to be used, the specification as originally filed by the patentee gave four examples (now to be found in Ex. 1 at p. 1, 11. 86–92; p. 2, 11. 51–54; p. 2, 11. 79–81 and p. 2, 11. 106–109.) These illustrations, which do not purport to be exclusive, show that the iron may vary from 94.94% to 98.04%, the electrolyte from 1.63% to 3.16% and the aluminum from 0.33% to 1.90% of the mixture. Fourteen months later on January 9, 1934, without supplemental oath, the patentee added to the specification (at what is now Ex. 1, p. 2, 11. 124–126) an amendment, the gist of which is that "It will be noted from the preceding examples that the aluminum is present in the mixture in comparatively small quantities. In practice I have found that the second metal, such as aluminum, need not constitute more than from about 1/10 per cent to 5 per cent of the mixture."

### C.   Claims in Suit.

8. Claims 1, 2, 3, 5, 7 and 8 are directed to a heat pad composition for producing a moderate and sustained heat by chemical action with water. As used in the claims, I find that the phrase "moderate and sustained heat" is not confined to temperatures in the vicinity of 150° F. but includes higher temperatures at least up to the boiling point of water. Claim 1 refers to "a mixture of iron in finely divided condition, an electrolyte, and a small quantity of a second metal selected from the group of metals appearing above iron and below the alkaline earth metals in the electromotive series of metals". The other claims differ in the following respects. Claim 2 specifies as the second metal "finely divided aluminum". Claim 3 specifies as the electrolyte a salt of a metal which is replaceable by the second metal. Claim 5 specifies as the second metal aluminum, and as the electrolyte a salt of a halogen acid. Claim 7 specifies as the electrolyte a salt of copper. Claim 8 refers to two electrolytes, one replaceable and the other non-replaceable by the second metal. Unlike the other claims, claim 10 is a method claim. It refers to the method of chemically producing a moderate and sustained heat by mixing iron, aluminum and an electrolyte and adding water.

### D.   Chemical Explanation of the Patent.

9. Underlying the patent are certain terms and phenomena familiar to chemists.

(a) The term "electrolyte" means a substance which when dissolved in water is capable of conducting an electric current.

(b) Metals fall into an "electromotive" or "displacement" series. A metal higher up in the series is able to displace a metal lower in the series from a solution containing a salt of the lower metal.

(c) A "replaceable electrolyte" is one which comprises a salt of a metal which is lower in the electromotive series than the base metal with which it is associated in the mixture, and which is, therefore, displaceable or replaceable by that base metal. A "non-replaceable" electrolyte is one with which such a reaction does not take place.

10. In the preferred mixture of the Reed patent (Ex. 1 p. 2, ll. 105–110; fdg. 6, supra), where iron, aluminum, lead chloride and potassium chloride are includ-

ed, these exothermic reactions occur when water is added:

(a) aluminum replaces the lead of the lead chloride, the lead being deposited in metallic form near the aluminum which replaces it;

(b) the oxygen of the water acts upon the aluminum, so that water decomposes, aluminum hydroxide is formed and hydrogen is given off;

(c) if air has access to the mixture, the oxygen of the air acts upon the aluminum;

(d) iron replaces the lead of the lead chloride, the lead being deposited in metallic form near the iron which replaces it;

(e) the oxygen of the water acts upon the iron, so that water decomposes, ferrous hydroxide is formed and hydrogen is given off;

(f) if air has access to the mixture, the oxygen of the air acts upon the iron.

These reactions progress simultaneously, the first three with aluminum being more vigorous than the last three with iron. The presence of the non-replaceable electrolyte (potassium chloride) somewhat accentuates the tempo of the reactions.

11. One of the special advantages of aluminum is due to the fact that it reacts more quickly than iron. It thus acts as a preheater or accelerator or kindler of the reactions in which iron participates. Moreover, the reaction of the aluminum makes possible a reduction in the amount of electrolyte necessary to produce a given amount of heat. Alternatively, it makes possible the use of one of the less soluble electrolytes, thus improving the stability of the mixture and avoiding the dangers which come from highly soluble electrolytes which tend to pick up moisture from the air and initiate chemical reactions in advance of the desired time.

12. Not only does aluminum aid and accelerate the reactions in which iron participates, (fdg. 11, supra), but the iron facilitates the aluminum reactions. The iron discharges the hydrogen ions which would otherwise collect on the surface of the aluminum and affect its reactions. Also, the iron reacts on the lead chloride; this forms ferrous chloride; aluminum displaces this ferrous chloride; and the displacement yields finely divided or activated iron which again goes through the cycle of heat-producing reactions more vigorously than iron did in its original condition.

## E. Prior Art

13. As the patent states (see fdg. 4, supra), there was nothing novel in the use in a heating combination of a metal, one or more electrolytes and, on occasion, an oxidizing agent. But there was something novel in the use of a second metal higher than the base metal in the electromotive series.

14. Baysinger patent No. 1,819,807 did, it is true, disclose the use of both crushed cast iron and carbon steel. But cast iron and carbon steel are to all intents and purposes iron, and occupy the same position in the electromotive series. The presence of both does not produce a higher temperature than one alone produces.

15. McNabb patent No. 1,126,055 also uses two metals, but the second metal (zinc) is lower in the electromotive scale than the base metal there relied on (aluminum). Moreover, McNabb does not refer to a replaceable electrolyte.

16. Wallace patent No. 1,488,656 contemplates the use of impure iron. But although Wallace contemplated that the iron might thus have small quantities of other metals, he did not indicate that they should be higher than iron in the electromotive series. And he did not suggest that the impurities affected the heating performance of the composition. Indeed he suggests the opposite.

17. Mann patent No. 1,901,313 does not refer to a second metal.

18. Baysinger, McNabb, Wallace, Mann and the other prior art patents do not anticipate the use of a second metal higher than the base metal in the electromotive series, and do not foreshadow the greater heat, economy of electrolytes, choice of electrolytes and improved heat regulability, all of which follow from such use.

## F. Invention

19. In so far as it is a question of fact I find that claims 1, 2, 3, 5, 7 and 8 of Reed patent No. 1,978,388 relate to an invention patentable under the laws of the United States. I do not find it necessary to make any finding with respect to the method claim, claim 10. Compare Electrical Fittings Corp. v. Thomas & Betts Co., 307 U.S. 241, 242, 59 S.Ct. 860, 83 L.Ed. 1263.

20. In so far as it is a question of fact I find that the phrase "a small quantity" (used in claims 1, 2, 3, 5, 7 and 8, to describe the amount of the second metal) means that the second metal constitutes but a small proportion of the entire mixture. It would have been difficult, if not impossible, to mark more precisely than the specifications now do the range of ratios which the second metal could bear to the whole composition. The description of the discovery, and of the manner and process of compounding it is in such full, clear, concise and exact terms as to enable any person skilled in the science to which it appertains to compound the same.

## G. Infringement

21. The hair-waving pads sold by defendant under the names Windsor and Park Avenue have used the following three formulae:

|  | formula 1 | formula 2 | formula 3 |
|---|---|---|---|
| finely divided iron | 22.0% | 25% | 30% |
| finely divided aluminum | 3.5% | 3% | 3% |
| copper sulphate | 2.5% | 5% | 10% |
| sodium chlorate | 6.0% | 6% | 10% |
| ammonium chloride | 6.0% | 6% | 7% |
| filler | 60.0% | 55% | 40% |

22. These three formulae are substantially the same and the three variations have been due principally to the lack of chemical purity of the particular ingredients used.

23. Defendant's formulae resemble plaintiff's preferred formula in including a base metal (iron), a small quantity of a metal higher in the electromotive series (aluminum), a replaceable electrolyte (copper sulphate) and a non-replaceable electrolyte (ammonium chloride). Defendant's formulae differ from plaintiff's preferred formula only in the addition of an oxidizing agent (sodium chlorate) and a filler. But, as explained in the next two findings, these are not significant differences.

24. In body warming pads and in some other uses of heat producing compositions, air has access to the heating mixture. The oxygen of the air therefore plays a role in the chemical reactions. But in hair waving pads air is occluded. Therefore, an oxidizing agent is necessary. Sodium chlorate is a familiar oxidizing agent. And its addition is obvious to any chemist as a substitute for the oxygen of the air. Indeed, mixtures in the art prior to Reed "in some cases * * * include an oxidizing agent." Ex. 1 p. 1, 11. 18–20.

25. In body warming pads a large mass of finely divided iron is included. This is to permit repeated use, as well as to give

bulk, and to moderate the intensity of the heat. But in hair waving pads what is contemplated is single use. Therefore some inert substance cheaper than iron will do. Fillers are substitutes familiar to chemists and have always been standard practice in the heating pad art. Their addition represents no significant change.

26. Thus defendant's pads fall within the scope of claims 1, 2, 3, 5, 7 and 8 of plaintiff's patent and infringe those claims. This infringement of these six claims is conveniently illustrated by the infringement of claim 8. Defendant's iron is the iron referred to in that claim; defendant's aluminum is "a second metal selected from the group of metals appearing above iron and below the alkaline earth metals in the electromotive series ·of metals"; defendant's copper sulphate is "an electrolyte comprising a salt of a metal which is replaceable by said second metal"; and defendant's ammonium chloride, being a non-replaceable electrolyte (although not a salt of a metal), is the chemical equivalent of "a second electrolyte comprising a salt of a metal appearing above said second metal in the electromotive series."

27. The presence of aluminum in defendant's pads is not merely to mask discoloration. It is essential to their hair-waving function. It is used to achieve the kindling effect of the Reed patent, to achieve greater heat generating capacity, to regulate the heat, to economize on electrolytes and to permit the use of less soluble electrolytes. Without aluminum or a similar metal higher than iron in the electromotive series these results could not be accomplished and defendant's pads would not perform their function.

28. The degree of heat achieved by defendant's pads and the period of time the heat is sustained are results which fall within the scope of claims 1, 2, 3, 5, 7 and 8 of Reed patent No. 1,978,388.

### Conclusions of Law.

1. Claims 1, 2, 3, 5, 7 and 8 of Reed patent No. 1,978,388 each set forth an invention or discovery of a new and useful composition which is patentable under the laws of the United States.

2. The use in those claims of the phrase "a small quantity" (as applied to the second metal) meets the standard prescribed by R.S. § 4888, as amended, U.S.C.A. T. 35, § 33. The testimony in this case, like the testimony in Eibel Process Co. v. Minnesota & Ontario Paper Co., 261 U.S. 45, 66, 43 S.Ct. 322, 67 L.Ed. 523, and unlike the testimony in Minerals Separation Ltd. et al. v. Hyde, 242 U.S. 261, 271, 37 S.Ct. 82, 61 L.Ed. 286, and in United Carbon Company et al. v. Binney & Smith Co., December 7, 1942, 63 S.Ct. 165, at pages 168–170, 87 L.Ed. ——, proves that the term does not lack the precision which persons skilled in the science would need to compound the discovery. Each of the claims referred to gives a written description of the discovery and of the manner and process of compounding it in such full, clear, concise and exact terms as to enable any person skilled in the science to which it appertains to compound the same. This conclusion is reached independently of any doctrine permitting the claims to be read in the light of the specifications.

3. The paragraph which appears at page 2, lines 122–131 of the specifications of the patent and which was added by amendment was a narrowing, not an enlarging, amendment. Prior to the amendment, the patentee had given illustrations which happened to have for aluminum a range of 0.33% to 1.90% of the total compound. But those illustrations and the rest of the specifications and claims as originally presented did not purport to exclude, but, on the contrary, substantially embraced, for aluminum a range of 0.1% to 5%. The amendment, therefore, does not fall within the provisions of Patent Office Rule 48, 35 U.S.C.A.Appendix, requiring in certain situations a supplemental oath. Heller Bros. Co. v. Crucible Steel Co., 3 Cir., 297 F. 39, 43.

4. If it be appropriate to read the phrase "a small quantity", appearing in the claims, in the light of the specifications (as is suggested in United Carbon Company et al v. Binney & Smith Co., supra, at pages 5 and 6 and in footnotes 14 and 15 of General Electric Co. v. Wabash Corp., 304 U.S. 364, 373, 58 S.Ct. 899, 82 L.Ed. 1402), there is a further reason for the conclusion stated in paragraph 2, supra, that the phrase "a small quantity" meets the standard prescribed by R.S. § 4888, as amended, U.S.C.A. T. 35, § 33.

5. The phrase "a small quantity" states what is the critical and operable proportion of the second metal required for the heating composition. It is the "exact term" needed to comply with the standard

prescribed by R.S. § 4888, as amended, U.S.C.A. T. 35, § 33.

■ 6. The phrase "moderate and sustained heat"[1] (appearing in the claim) is a full, clear, concise and exact term to describe the functions of and results achieved by the discovered compound. It complies with the standard prescribed by R.S. § 4888, as amended, U.S.C.A. T. 35, § 33.

■ 7. Claims 1, 2, 3, 5, 7 and 8 of Reed patent No. 1,978,388 are valid. It is unnecessary to pass upon the validity of claim 10. Compare Electrical Fittings Corp. v. Thomas & Betts Co., 307 U.S. 241, 242, 59 S.Ct. 860, 83 L.Ed. 1263.

8. The hair-waving pads sold by defendant under the names Windsor and Park Avenue infringe claims 1, 2, 3, 5, 7 and 8 of Reed patent No. 1,978,388.

9. In the defendant's pads sodium chlorate is the equivalent of the oxygen of the air, and the filler is of no significance on the issue of infringement.

There shall be entered a decree, in the usual form, adjudging claims 1, 2, 3, 5, 7 and 8 of Reed patent No. 1,978,388 valid and infringed; enjoining defendant from further infringement; and ordering an accounting for past infringement.

---

[1] At R. 444 the Court erroneously stated the result of the experiment conducted in open court by Mr. Grant with Exhibit I. The result was that that exhibit became inflated and discolored, but it did not blow up and catch fire.