The **TRIAX COMPANY**, Plaintiff-
Appellant,

v.

**HARTMAN METAL FABRICATORS,
INC.**, Defendant-Appellee.

Nos. 35, 36, Dockets 71–1843, 71–1978.

United States Court of Appeals,
Second Circuit.

Argued Nov. 27, 1972.

Decided May 31, 1973.

Thomas V. Koykka, Arter & Hadden, Cleveland, Ohio, George S. Baldwin, Richard J. Egan, Robert J. Fetzer, Baldwin, Egan, Walling & Fetzer, Cleveland, Ohio, George W. Shaw, Cumpston, Shaw & Stephens, Rochester, N. Y., for plaintiff-appellant.

B. Edward Shlesinger, Philip K. Fitzsimmons, Shlesinger, Fitzsimmons & Shlesinger, Rochester, N. Y., for defendant-appellee.

Before WATERMAN, FRIENDLY and HAYS, Circuit Judges.

WATERMAN, Circuit Judge:

In this action The Triax Company alleges that three of its patents relating to automatic "stacker" machines it manufactures for use in its patented automated warehousing system were infringed by the "stackers" the defendant Hartman Metal Fabricators, Inc. has manufactured, sold, and installed in warehouses. Hartman defends on the ground that the three Triax patents are invalid for obviousness under 35 U.S.C. § 103; and that, even if they are valid, they are not infringed. The three patents in suit (a Lemelson patent and two Chasar patents) describe an automated warehousing system of the kind in relatively common use among large manufacturing concerns and other types of commercial enterprises. The purpose of the system is to provide an inexpensive and efficient way to handle goods and materials which flow through, and are stored in, warehouses. The typical installation consists of sets of high rise storage racks, rising to heights of 100 feet or more, and extending to lengths of from 120 feet to over 800 feet, which are arranged in parallel rows in a large room. Each set of storage racks consists of two side panels containing a multiplicity of storage bins. The panels are separated by a narrow aisleway that contains a "guide rail" running along the floor of the aisleway or above the aisleway higher than the height of the highest bin. The storage-retrieval machine or "stacker" moves along the aisleway on the guide rail carrying loads to and from specific, pre-selected bins in pre-selected storage racks. The machine is self-propelled; it functions automatically on the basis of programmed instructions which are fed by a control operator into a control panel located on the base of the machine. The design of the stacker is rela-

tively simple: it consists of a "shuttle arm" or shuttle table which extends laterally to pick up and deposit the load; an elevator carriage which raises the load to the proper height (the elevator runs along a "mast" which is a part of the stacker); and the electrical apparatus which controls both the vertical and horizontal automatic movements of the machine. When programmed to deposit a load, the stacker positions itself by the side of a loading platform, its home station for pickup or discharge, which is located at one end of an aisleway having columns of high rise storage racks on either side thereof. When so positioned, the shuttle arm or table, upon receiving the programmer's command, extends out under the materials programmed for storage, lifts the materials from the loading platform, and then retracts. Having acquired its load the stacker automatically moves away from the loading platform in a horizontal direction down the aisleway. When it reaches the proper distance so that it is opposite the pre-selected stack of bins it stops, the loaded shuttle table moves up the mast, stops automatically at the height of the pre-selected bin, and deposits the load there. After warehousing its load the shuttle table moves down the mast, and the stacker returns automatically to the home station loading platform.[1] At this point the stacker can be programmed to perform another command.

The Lemelson patent (No. 3,119,501) covers the elements that constitute the system and particularly covers the electrical apparatus which controls the automatic vertical and horizontal movements of the stacker.

The two Chasar patents (No. 3,139,994 and No. 3,219,207) cover three mechanisms which affect the operational ability of the stacker in various ways. Under the claims of Chasar 994 the stacker can be programmed to perform two commands, a command to load an article into one bin and a command to retrieve an article from another bin, or vice-versa, before it returns to the home loading platform for reprogramming. This ability to perform two commands would appear to be a new feature of the machine; earlier machines had the capability of executing but one command (either a storage command or a retrieval command) before returning to the home loading area. Chasar 994 also claims the mechanism by which the shuttle table of the stacker will automatically retract if the bin into which the article is to be deposited already holds another load. By virtue of this device, collisions between loads are avoided. In Chasar 207 the third mechanism is claimed, an "evil eye" measuring device which measures the height of the load that is to move onto the stacker. If the load is too tall to fit into the pre-selected storage bin the load breaks a light beam emitted by a source located on the stacker, thereby causing a photocell measuring device in the control circuit to stop the stacker's progress.

After a trial in the United States District Court for the Western District of New York, Judge Harold Burke found that all three of the plaintiff's challenged patents were valid, but that none of the patents were infringed by the defendant's accused apparatuses. Plaintiff Triax now appeals the finding that its valid patents were not infringed, and defendant Hartman cross-appeals the finding of the patents' validity. For reasons which follow, we hold that the two Chasar patents which the lower court found to be valid are invalid for obviousness, and we agree with the lower court that the Lemelson patent is valid, but, although valid, has not been infringed. Accordingly, we affirm the judgment below in defendant's favor, although we affirm for different reasons

---

1. The system also works the same way when it is programmed to return a load. Thus the empty stacker moves away from its home loading platform, proceeds in a horizontal direction along the "guide rail" to the pre-selected column of bins, then the elevator carriage rises along the mast to the height of the pre-selected bin, then the extractor extracts the load, and the stacker returns with it to the loading platform.

from those relied upon by the trial court when it entered judgment for the defendant.

### Chasar Patents 994 and 207

We have little difficulty in concluding that the challenged devices in both of these patents are invalid for obviousness. The tests for obviousness were described in Graham v. John Deere Co., 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966) as follows:

> Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined. 383 U.S. at 17, 86 S. Ct. at 694.

Accord, Reeves Brothers, Inc. v. U. S. Laminating Corp., 417 F.2d 869 (2 Cir. 1969). Citing a prior Chasar patent (3,132,753) and a British patent (British Sterling Patent No. 866,107), Hart-

man argues, we think convincingly, that the dual command and bin reject elements of Chasar 994 were amply foreshadowed in the prior art. Applications seeking grants of these two patents were pending at the time the application which matured into Chasar 994 was filed, and there is no doubt that they are relevant prior art.[2] Moreover, inasmuch as neither of these pending applications is disclosed in the file wrapper of Chasar 994 the ordinary presumption in favor of the validity of a granted patent is severely undercut. See, e. g., Lemelson v. Topper Corporation, 450 F.2d 845 (2 Cir. 1971), cert. denied, 405 U.S. 989, 92 S.Ct. 1253, 31 L.Ed.2d 456 (1972); Reeves Brothers, Inc. v. United States Laminating Corp., supra, 417 F.2d at 872; Continental Can Co. v. Old Dominion Box Co., 393 F.2d 321, 326 n. 8 (2 Cir. 1968); Formal Fashions, Inc. v. Braiman Bows, Inc., 369 F.2d 536, 539 (2 Cir. 1966). Also, close reading of the British patent seems to disclose the precise dual command mechanism which is claimed in the plaintiff's challenged patent.[3] In Sterling the "transporter"

2. Hazeltine Research, Inc. v. Brenner, 382 U.S. 252, 86 S.Ct. 335, 15 L.Ed.2d 304 (1965); Reeves Brothers, Inc. v. U. S. Laminating Corp., 417 F.2d 869, 871 n. 4 (2 Cir. 1969). Inasmuch as there is no evidence that the invention contained in Chasar 994 occurred prior to the filing date we measure the prior art from that date. See Alexander Milburn Co. v. Davis-Bournonville Co., 270 U.S. 390, 46 S.Ct. 324, 70 L.Ed. 651 (1926). Both the British Sterling patent and Chasar 753 were pending in the Patent Office at the time the Chasar 994 application was submitted. We also note that a patent of an inventor may be part of the relevant art existing at the time of a subsequent application of the same inventor. See Pierce v. Allen B. DuMont Laboratories, Inc., 297 F.2d 323 (3 Cir. 1961), cert. denied, 371 U.S. 814, 83 S.Ct. 24, 9 L.Ed. 2d 55 (1962); Application of Jaegern, 241 F.2d 723, 44 C.C.P.A. 767 (1957); In re Land, 109 F.2d 246, 27 C.C.P.A. 863 (1940).

3. Claim 1 reads as follows:
   A storehouse for goods comprising a structure divided into a number of storage floors each having storage slots to receive goods, a hoist for raising and lowering goods to and from the different storage floors, a transporter for moving the goods horizontally between the hoist and the storage slots, an electrically controlled director adapted to control automatically a "deposit" or "collect" cycle of operations as required including the steps of controlling the movement of the hoist and the transporter to a position at the selected floor opposite to the selected slot and depositing or collecting goods at or from the selected slot and conveyor means operable to move the goods into or out of the selected slot as required, depending upon whether the electrically controlled director has initiated a "collect" or "deposit" cycle, *the electrically controlled director being so arranged that if, during a "deposit" cycle, instructions are registered to collect from any slot other than that to which deposit is being made, the transporter after completing the deposit operation, will be operated under the control of the electrical director to carry out a "collect" operation without having to return to the ground floor first.* (Emphasis added)

and "hoist" seem to have the capability of depositing one load and collecting another load prior to returning to the ground floor. The earlier Chasar patent (753) discloses the same storage-retrieval machine as the one claimed in the challenged Chasar patent, and, when these two patents are read together, the conclusion seems inescapable that the dual command means was obvious to anyone with ordinary skill in the art.

The same conclusion of invalidity must be reached with respect to the bin reject mechanism—based again on a reading of the earlier Chasar patent (753). Indeed, this mechanism appears to be expressly set out in Claim 4 of that earlier patent:

> Claim 4. A load transfer and storage apparatus as set forth in Claim 1 wherein the recited control means includes means responsive to loads positioned simultaneously on both said selected support means *and said carrier stopping, before collision damage occurs, travel of said laterally extendible frame in the direction of said storage frame*, and means automatically thereafter returning said carrier to said station. (Emphasis added).

Accordingly, we find that both mechanisms in Chasar 994 are invalid for obviousness.

We also agree with Hartman that Claim 6 of Chasar 207 disclosing the photoelectric cell measuring device is invalid for obviousness. Indeed, this kind of device was in such ordinary use that it would have been obvious to almost anybody, not only those skilled in the art. In particular we rely on two patents cited in Hartman's brief (the Macchi U.S. Patent No. 2,118,651, and the Lauterbach U.S. Patent No. 2,366,-152) in finding this patent invalid. Neither of these patents was disclosed in the 207 file wrapper.

Macchi claims a system for automatically controlling the feeding of coal into a furnace in order to maintain a predetermined coal level. The system employs a photoelectric cell measuring device whereby a light source is emitted within the furnace in the direction of the coal. When the level of the coal is so high that it intercepts the light beam, the photoelectric cell is effected to deenergize the feed motor, thereby stopping further delivery of coal into the furnace. The Lauterbach patent discloses a method for measuring the height and width of railroad cars by the use of an "evil eye" light source and photoelectric cell measuring device. When the height or width of the cars breaks the beam the photoelectric cell causes a warning signal to be set off, and the car which triggers the warning signal is thereby identified as being too high or too wide to negotiate a pre-selected railroad route.

Although we are mindful of the dangers of hindsight in declaring a patented device "obvious," we think the load height measuring means of Chasar 207 was clearly anticipated by these two patents. The use of a light beam in combination with a photoelectric cell to measure heights is specifically disclosed in both the Macchi and Lauterbach patents, as is also the means by which the extracting device is automatically deenergized through reaction with the photoelectric cell. Accordingly, we find that Chasar 207 is invalid.

*Lemelson 501—Is It Valid?*

Essentially, Hartman argues that this patent (Claims 1, 2, and 6) is invalid for three reasons: that new matter (Figure 25) was introduced into the original application in violation of the Patent Statute (35 U.S.C. § 132) and the Rules of Practice of the Patent Office (Rule 1.-118); [4] that, in violation of 35 U.S.C. §

---

4. Although in its brief Hartman does not cite which rule it claims was violated, we assume it was Rule 1.118 which corresponds to 35 U.S.C. § 132. This section states, in pertinent part: ". . . No amendment shall introduce new matter into the disclosure of the invention."

112,[5] the patent does not disclose the invention to a person skilled in the art; and that the claims were not patentable over the prior art. After a careful assaying of these arguments we disagree, and we find that Lemelson 501 is valid. Admittedly, the Lemelson application, Serial No. 449,874, first filed on July 28, 1954, had a difficult time in the Patent Office. From the filing date until October 30, 1959 the Examiner, in five separate official actions, refused to grant the patent, essentially because the disclosure of the electrical system which was to control the stacker failed to provide sufficient specificity as to its component parts and its design to comply with the patent statute (35 U.S.C. § 112).[6] To remedy this defect Lemelson amended his application in 1959 by filing a new drawing, Figure 25, "to show a basic electrical circuit used in the automatic conveying system." In the official action of April 28, 1960, almost six years after the application was originally filed, the Examiner admitted Figure 25 as a part of the application. However, even then the application was still not completely acceptable and, after an interview with the Examiner, Lemelson decided to submit, and finally did submit, a new application dated October 10, 1961. This application, which was given Serial No. 145,013, was intended to be a continuation of the prior application and to have

the benefit of the earlier filing date of the prior application. See 35 U.S.C. § 120.[7] The drawing in this new 1961 application setting forth the electrical circuit was identical to Figure 25 of the 1959 amendment to the prior application except that reference numbers were added. After some additional delays and further amendments the application Serial No. 145,013 was finally approved by the Examiner. It matured into Lemelson 501 as of January 28, 1964.

■ Defendant argues that inasmuch as the Examiner found that the disclosures of application 449,874 (the original application) were "incomplete" prior to the introduction of Figure 25 in 1959, Figure 25 must have been "new matter" which embodied invention outside the bounds of the original application. However, this argument overlooks the fact that an amendment to an application is not "new matter" within the Patent Act or Rules of the Patent Office unless it discloses "an invention, process or apparatus not theretofore described." Reeves Brothers, Inc. v. U. S. Laminating Corp., 282 F.Supp. 118, 130 (EDNY 1968), affirmed, 417 F.2d 869 (2 Cir. 1969) ; accord, Schriber-Schroth Co. v. Cleveland Trust Co., 305 U.S. 47, 57, 59 S.Ct. 8, 83 L.Ed. 34 (1938). If the later-submitted material accused of being "new matter" simply clarifies or com-

5. This section states, in pertinent part:
§ 112. Specification
The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

6. For example, in the second official action (Paper No. 5, October 11, 1956, page 3) the Examiner stated: "No complete electrical circuit has been shown in the drawings that would provide for 'automatic' operation, nor is the specification an aid in this regard." This would appear to be indicative of the Examiner's

reason for rejecting the application on all occasions.

7. § 120. Benefit of earlier filing date in the United States
An application for patent for an invention disclosed in the manner provided by the first paragraph of section 112 of this title in an application previously filed in the United States by the same inventor shall have the same effect, as to such invention, as though filed on the date of the prior application, if filed before the patenting or abandonment of or termination of proceedings on the first application or on an application similarly entitled to the benefit of the filing date of the first application and if it contains or is amended to contain a specific reference to the earlier filed application.

pletes the prior disclosure it cannot be treated as "new matter." See Application of Wright, 343 F.2d 761, 52 C.C.P. A. 1185 (1965); H. H. Robertson v. Klauer Mfg. Co., 98 F.2d 150, 152–153 (8 Cir. 1938); Lee v. Congress Beauty Equipment Co., 48 F.Supp. 827 (D. Mass.1943). Moreover, the determination of the Patent Office to admit the later-submitted material, thereby signifying that the Patent Office does not consider it to be "new matter," is presumptively correct. See Helms Products, Inc. v. Lake Shore Mfg. Co., 227 F.2d 677 (7 Cir. 1955); Baldwin-Lima-Hamilton Corp. v. Tatnall Measuring Systems Co., 169 F.Supp. 1 (ED Pa. 1958), affirmed, 268 F.2d 395 (3 Cir. 1959), cert. denied, 361 U.S. 894, 80 S. Ct. 190, 4 L.Ed.2d 151 (1959). We think Figure 25 was a clarifying amendment rather than an amendment which disclosed "an invention, process, or apparatus not theretofore described." Reeves Brothers, Inc. v. U. S. Laminating Corp., *supra*, 282 F.Supp. at 130. The Examiner, after very careful consideration, decided to admit Figure 25, and Hartman has not presented us with any convincing evidence to rebut the presumption that the Examiner's decision was correct. See Power Curbers, Inc. v. E. D. Etnyre & Co., 298 F.2d 484, 493 (4 Cir. 1962); Manville Boiler Co. v. Columbia Boiler Co. of Pottstown, 269 F.2d 600, 604, 605 (4 Cir. 1959), cert. denied, 361 U.S. 901, 80 S.Ct. 208, 4 L. Ed.2d 156 (1959).

Hartman also contends that the Lemelson patent is invalid under 35 U.S.C. § 112 for incomplete disclosure. Hartman's argument is based on the fact that at trial Dr. Ronald G. Schultz, a Triax expert witness, in order to explain fully the operation of the Triax device,

had to produce additional drawings of his own making which were not disclosed in the patent. Dr. Schultz did prepare some of his own drawings for use in court, but he did so only for the purpose of explaining the Triax system to the court. He did not say at any time that a man who possessed ordinary skill in the art could not make and use the invention by recourse to the disclosures contained in the patent. To the contrary, he specifically testified that everything embodied in his drawings came from the description disclosures contained within the Lemelson patent. Accordingly, Hartman's argument that the disclosures were inadequate is clearly without merit and we reject it.

■ We also reject Hartman's contention that Triax could not have the benefit of the original application's filing date of July 28, 1954 for purposes of measuring patentability.[8] Under 35 U. S.C. § 120, if the later application refers to the earlier one and contains the same basic information, it is entitled to the earlier filing date for purposes of its patentability in relation to relevant prior art. See Acme Highways Products Corp. v. D. S. Brown Co., 431 F.2d 1074 (6 Cir.1970), cert. denied, 401 U.S. 956, 91 S.Ct. 977, 28 L.Ed.2d 239 (1971). As we have mentioned earlier, Hartman has not provided this court with any convincing evidence to support its apparent position that the 1961 application discloses matter not disclosed in the earlier 1954 application. To the extent that Figure 25, discussed above, is the "new matter" Hartman claims disentitles the later application to the earlier filing date, we reject Hartman's argument, for we find Figure 25 not to be "new matter." Furthermore, we know of no further reason, and Hartman has

8. The Burke U.S. Patent No. 2,941,738 granted on June 21, 1960 on an application filed on June 12, 1958, the French Sterling Patent No. 1,227,258, a companion of the British Sterling, granted on October 6, 1960 on an application filed on December 19, 1958, and the British Sterling Patent, granted on April 26, 1961 on an application filed December 20, 1957, all claim features which would have arguably made the Lemelson 501 in 1964 obvious to one with ordinary skill in the art. Therefore, it is important for Lemelson to have the benefit of the 1954 filing date.

not provided us with any, to believe that the later application should not be considered a continuation-in-part of the earlier application. Accordingly, we think prior art should be measured as of the 1954 filing date, at which time the Lemelson invention was clearly patentably. We find the Lemelson patent valid.

### Do the Hartman Apparatuses Infringe?

In support of its claim that the Hartman stacker infringes the Lemelson patent Triax maintains that the design and operation of the Hartman stacker is so similar to the design and operation of its own stacker that the two machines are, in effect, equivalent, and therefore the Hartman machine infringes the Lemelson patent under the well established "doctrine of equivalents." Determining whether, vel non, the doctrine of equivalents applies to a given set of facts has never been, for obvious reasons, an easy matter for court resolution. The broadly stated test, enunciated in Graver Tank & Mfg. Co. v. Linde Air Products Co., 339 U.S. 605, 608, 70 S.Ct. 854, 94 L.Ed. 1097 (1950), quoting Sanitary Refrigerator Co. v. Winters, 280 U.S. 30, 50 S.Ct. 9, 74 L.Ed. 147 (1929), is whether the challenged device "performs substantially the same function in substantially the same way to obtain the same result" as the challenging device. In applying this test the court is guided by a corollary rule, soundly developed from the sensible proposition that some inventions by their very nature deserve slightly more extensive legal protection than others— the rule that, if a patent is a pioneering patent the patentee is allowed a wide range of equivalents, but if the patent is a narrow patent or the art is crowded the patentee is only allowed a correspondingly narrower range. See Parmelee Pharmaceutical Company v. Zink, 285 F.2d 465 (8 Cir. 1961). Furthermore, a factual finding by the lower court that a particular device is or is not equivalent to another device is not to be disturbed by appellate judges unless

that finding is clearly unsupported by the trial record. See Graver Tank & Mfg. Co. v. Linde Air Products Co., supra; Parmelee Pharmaceutical Company v. Zink, supra.

Upon our close examination of the record relative to the two stackers here involved we cannot say that the district judge's finding of non-infringement was clearly erroneous. Rule 52, Fed.R.Civ.P. In reaching this conclusion we note substantial differences between the Hartman stacker and the Triax stacker.

First, there are differences in design between the two machines. Triax claims a laterally *extended* fixture which juts out from the frame of the stacker and which supports and carries the load. Resembling a laterally extending fork apparatus, it is attached to the frame of the stacker's elevator carriage so that the fixture can move vertically as this carriage moves up and down the mast. Inasmuch as the fixture *always projects laterally* from the stacker the aisleway between the storage racks in which the stacker moves must be wide enough to accommodate the distance of this lateral projection. Also, although the fixture automatically moves into and out of the storage bins when it retrieves or deposits a load, the frame of the stacker to which the fixture is attached moves together with the fixture as the fixture moves. Because the fixture projects laterally from one side of the stacker, the stacker can only service one side of the aisleway at a time. In order for the Triax apparatus to service both sides of an aisleway its stacker would either need to have fixtures extending from both sides of the stacker—thus necessitating an even wider aisleway—or it would need to provide the means for rotating the stackers—which means are not claimed in the Lemelson patent.

In contrast to the Triax machine, the Hartman stacker has a laterally *extensible* apparatus which is normally housed *within* the elevator and which does *not*

always project laterally. When the apparatus (extractor) deposits a load into a bin, or retrieves a load from a bin, it moves outwardly and, unlike the Triax apparatus, the frame of the stacker does not also move. The Hartman stacker can extend laterally in either direction so that both sides of the aisleway can be serviced without rotating the stacker. Moreover, since the extractor is normally housed within the elevator, the aisleway need not be wide enough to accommodate the distance it occupies when the extractor is extended.

Second, there are operational differences between the two machines. In Hartman the elevator carriage on the stacker moves vertically up the mast to the proper height while the stacker is proceeding down the aisleway. This mode of operation caused Judge Burke to state that, as the Hartman carrier simultaneously travels both horizontally and vertically, the load carried by the carrier, if observed from the vantage point of the bin into which it is to be deposited, appears to move horizontally toward that bin. In contrast, the Triax stacker moves down the aisleway to the programmed position and stops; after it stops this horizontal motion the stacker's carriage moves vertically up the mast to the level of the proper bin. The two systems also differ in the electrical

means used to control the stopping of the vertical movement of the stacker at the proper bin. The Lemelson patent claims "means on the storage rack for identifying the relative positions" of the bins. The Triax system has "reflective markers" placed at each bin on each storage rack which are scanned by photoelectric scanners on the self-propelled elevator carriage. By contrast, the bin position at which the Hartman load carrier is to stop is determined by an electrical control of pins on an endless chain that raises or lowers the elevator. The chain and pins are carried by the Hartman stacker and engage and trip a switch on the Hartman stacker's mast to stop the vertical movement of the elevator at the pre-selected bin. Because of the diagonal motion of the Hartman load it would be impossible for Hartman to use "reflective markers" on a storage rack.[9] Also, Hartman differs from Lemelson in the way in which the horizontal movement of the stacker down the aisleway is controlled. In Lemelson the stacker is guided by a "predetermining counting" mechanism which, upon receipt of a predetermined number of position-indicating signals, "uncounts" to stop the drive means. By contrast, the Hartman stacker's position longitudinally down the aisleway is determined

---

9. This finding appears in the lower court's opinion as Finding 6:

Hartman's load carrier has a diagonal motion in travelling to a bin to deposit or to pick up a load. It does not travel horizontally first, then stop, and then travel vertically to the selected bin and stop. It simultaneously travels horizontally and vertically. Because of this diagonal motion it is impossible for Hartman to use means on the storage racks for identifying the relative positions of the storage bays, because of the different angles presented by diagonal travel.

10. The Lontz Patent, granted on October 12, 1954, cited in Lemelson, claims certain features which lead us to conclude that Lemelson was not a pioneer. For example, Claim 1 of Lontz reads as follows:

1. In a storage system having a plurality of serially arranged storage compartments and a loading station; a conveyor movable between said station and compartments, said conveyor including means for engaging loads in said loading station and depositing the loads in said compartments, actuating means energizable for moving said conveyor, control means for controlling the energization of said actuating means and having a plurality of conveyor energized positions, one for each said compartment, and a single conveyor de-energized position, means for initially positioning said control means in one of its conveyor energized positions and for then establishing an energizing circuit for said actuating means, means operable by movement of said conveyor past the compartments intervening be-

through the engaging by a switch on the stacker of a series of transverse bars between opposed storage rack frames.

Lemelson is not a "pioneering patent,"[10] and we have no hesitancy in concluding that its range of equivalents is relatively narrow. The differences between the Triax and Hartman apparatuses, considered individually, might not be of sufficient importance or magnitude to save Hartman's apparatus from the reach of even the narrow range of equivalents assigned to Lemelson, but when the differences are taken as a bundle and are considered in the context of the apparently increased capabilities and improved performance of Hartman, we hold that they are. In reaching this conclusion we fully recognize that the question of whether particular differences between a challenged device and a device enjoying patent protection are sufficient to carry the challenged device outside the range of equivalents of the patented device is one "[on which] courts have differed and always will differ" (Royal Typewriter Co. v. Remington Rand, 168 F.2d 691 (2 Cir. 1948) (L. Hand, J.), cert. denied, 335 U.S. 825, 69 S.Ct. 50, 93 L.Ed. 379 (1948)). However, upon a final analysis here, we think it can fairly be said that the Hartman machine, although it performs substantially the same function as the Triax machine, does not perform it in "substantially the same way," see Graver Tank & Mfg. Co. v. Linde Air Products Co., *supra*, and that, in any event, the finding of noninfringement by the district court was not "clearly erroneous." Rule 52, Fed.R.Civ.P.

Judgment affirmed.

tween the loading station and the selected one of said compartments corresponding to the said one position of said control means for returning the control means step by step to its conveyor de-energized position, and a cycle controller operable to cause said conveyor first to engage a load in said loading station, then to move under the influence of said actuating means into the said one compartment, then to deposit the load in the said compartment, and, lastly, to return to said loading station, all during a single integrated cycle.
We think the concept expressed in this Claim precludes a finding that Lemelson was a pioneer.