**TAPCO PRODUCTS COMPANY,**
Plaintiff-Appellant,

v.

**VAN MARK PRODUCTS CORPORATION and Eugene Van Cleave,**
Defendants-Appellees.

No. 20835.

United States Court of Appeals, Sixth Circuit.

July 12, 1971.

Basil C. Foussianes, Detroit, Mich., for plaintiff-appellant; John M. Kisselle, William H. Francis, Barnes, Kisselle, Raish & Choate, Detroit, Mich., on brief.

Bernard J. Cantor, and Daniel G. Cullen, Detroit, Mich., for defendants-appellees; Hiram P. Settle, Jr., Cullen, Settle, Sloman & Cantor, Detroit, Mich., on brief.

Before WEICK, PECK and McCREE, Circuit Judges.

WEICK, Circuit Judge.

The suit in the District Court was for infringement of the Marsh Patent No.

3,161,223, issued December 15, 1964, on a sheet metal brake,[1] which patent had been assigned to Tapco. Appellee Van Cleave had been in the employ of Tapco when the brake was being developed. After leaving Tapco's employ he organized appellee Van Mark Products Corporation and commenced to produce a brake almost identical with the patented brake.

Tapco sued the appellees in the Circuit Court of Wayne County, Michigan, for unfair competition and appropriation of trade secrets. The suit was settled by Van Mark taking a non-exclusive license under the Marsh patent, which provided for a royalty to Tapco of 5½%, with $10,000-pre-payment of royalties. Thereafter Van Mark did not comply with the royalty provisions of the license agreement and Tapco gave notice of termination and instituted the present action in the District Court for infringement of patent, unfair competition, and causes of action under the license agreement.

By agreement of the parties, the District Court heard only the patent infringement claim. After hearing the evidence the Court handed down an opinion holding that the patent was invalid. 318 F.Supp. 79. Tapco appealed.

The Marsh patent discusses the prior art and the objects of the invention, as follows:

"It has heretofore been suggested that a brake for bending and forming sheet metal such as aluminum coil stock may comprise a pair of members which are hinged to one another by a hinge such as a piano hinge having the leaves thereof fixed to the respective members. In the construction of such a brake in substantial length so that long lengths of sheet metal can be bent and formed, a major problem is that extreme difficulty is encountered in aligning the hinge leaves with respect to the longitudinal edges of the first and second members. This inaccuracy not only results in an improper bend but, in addition, mars the surface of the sheet metal where it is coated with an enamel or other coating.

"It is an object of this invention to provide a novel brake for bending and forming sheet metal which obviates the foregoing disadvantages of prior art brakes.

"It is a further object of the invention to provide such a brake which is light in weight, simple to operate and low in cost."

Claim 7 of the patent, which is relied on by Tapco, provides:

"7. In a brake for bending sheet metal, the combination comprising

a first member having a flat clamping surface,

an anvil member for clamping a piece of metal against said flat clamping surface on said first member,

a second member having a flat bending surface,

each of said first and second members having substantially the entire length of the longitudinal edges thereof formed with longitudinally spaced intermeshing integral projections.

each said projection of each said member having a surface thereof lying in the plane of the flat surface of its corresponding member,

said projections having aligned openings therein,

and a hinge pin extending through said integral projections and thereby defining a hinge so that said second member may be swung relative to said first member to bend said metal about said anvil member."

Prior to issuance of the patent Tapco had been a distributor for a brake embodying the features of the Rauen prior art patent number 3,147,791, manufactured by Lyf-Alum, Inc., of which the

---

1. "Brake" is the term used for a machine that bends sheet metal. The patented device was used principally for bending aluminum sheets to be used for siding, windows and doors of houses.

patent in suit is an improvement principally in the hinge arrangement which connects the clamping member with the bending member. The Rauen hinge was separately attached to the clamping and bending members by bolts or screws.

In the Marsh patent the hinge was formed by intermeshing integral projections extending the entire longitude of the edges of the clamping and bending members. Each projection has a flat surface in the plane of the flat clamping and bending surfaces. A pin extends through the projections in order that the bending member may be swung about the clamping member and may bend the metal on the anvil. The hinge on Rauen has a round rather than a flat surface.

Dr. Youngdahl, plaintiff's expert witness, testified that the Marsh patent produces a straighter, sharper, and more uniform bend than does the Rauen patent, and does not mar the surface of the metal. He attributed this to the fact that the Marsh hinge more closely confines and supports the metal as the bending member reaches a vertical position. It was his opinion, demonstrated by a test which he made, that the Rauen hinge leaves a longitudinal groove, or a gap, between the clamping and bending members which results in less support or confinement of the metal during the final portion of the bend. He further testified with respect to the Rauen brake:

"Now on that we are going to put our piece of sheet metal and we will clamp that piece of sheet metal—I'll use white chalk for that—with our clamping member, an anvil. To cause our bend we are going to pivot about this point. I think you can see, your Honor, that all I have done is just looked right at the end. We are only looking at this end view. We have to realize that this piano hinge goes a long way down here and these surfaces go down. We are going to pivot member 17 about 16 at this point and cause our sheet metal to bend.

"Now when that bending occurs this area at the hinge and the space, the metal is unsupported, there is nothing there to support it. If we move the hinge up where it contacts the metal, it puts a mark on it. This metal in this stock that we are bending has a thin coat of paint on it, oven white. They are going to put it on a man's house and if he sees these marks on it he won't pay for the job, is what it amounts to.

"So if the hinge is set high it marks it, the piano hinge; and if it's set low, it's unsupported. Then when you cause your pivot, your part 17 to pivot about the hinge and come up, you apply the force out where you have contact. The place where you have no contact has no force applied, is unsupported and tends to bulge. In fact, when you get your bend completed you end up with a bend that is not square and is not uniform but rather comes down and has a bulge in it, and that bulge varies along the length of the piece so as you sight down the piece, one place it might be square, another place the bend might have a bulge in it more or less and it isn't uniform. It's a random thing. When you don't support it and don't control it you have a random bulging that can occur along the full length because you realize I have only drawn one section and this is 8 or 10 feet long.

"THE COURT: That's the Rauen patent you are talking about?

"A. That's the Rauen patent I am talking about."

With respect to the Marsh hinge, Dr. Youngdahl concludes:

"Our sheet metal before bending is lying flat. It's in contact there. As we bend up we have surface contact and our metal is under control all the time. We know what's going to happen to it and we get a better bend. You can see right here where each of these projections have a surface and if we put a ruler on there it's supported in the area of the hinge. In a brake of considerable length, say, an 8′ foot brake, that amounts to a lot of area.

This is much enlarged in scale but it wouldn't be at all unreasonable for that dimension that is unsupported there to be ³⁄₁₆th of an inch, in fact, I think it's quite conservative. ³⁄₁₆th is very little in a piano hinge, to fit a piano hinge in. If I were to take that ³⁄₁₆th of an inch and multiply it by 8', it would be ³⁄₁₆ths x 8' x 12" per foot, and I get 18 square inches that I now support rather than have unsupported; and it's this additional support that, in my opinion, is the biggest factor in making a better bend on the patented brake than on a brake with a piano hinge."

In comparing the final stages of bending, as the bend approaches the vertical, using the Rauen hinge to the result achieved with the Marsh hinge, Dr. Youngdahl testifies:

"I didn't intend to show that that all occurred right at this position. Where that flow of metal occurred is on the way up. You can see it. There is no support in there on the way up so you have no way of applying pressure on that up at the top and take that kink out. You can see it on the parts and you can see it on the brake."

The District Judge, during cross-examination of Dr. Youngdahl, became cognizant of the invention when he stated:

"THE COURT: I think I've got his point. His point is that the projections, like take the top of a rubber ball and you cut off the top and it's straight across and that's what I think he is trying to say. Here the hinge leaves a little space between the rounded portion as it goes into the remaining top of the instrument but in their claim, the Marsh patent, I think he is trying to say that the hinge has been flattened off on top so that it's solid across; am I correct?

A That's right, that's exactly what it says.

THE COURT: That's what you think is, in your opinion, a substantial difference sufficiently which would merit a patent and I think that is why you added your Claim 7 in your wording, is that right?

A That's right.

Q (By Mr. Cantor, continuing): That's what you consider to be the invention here?

THE COURT: Yes, that's right.

A Yes, simply."

Defendants' only expert witness, Frank, whose deposition was read into evidence, testified only about the Noyes patent. There is no testimony in the record to refute Dr. Youngdahl's theories.

Appellees contend that the use of an integral hinge is old. The Patent Examiner recognized this, but allowed claim 7 for a different reason, stating:

"1. Figure 3 of the drawings has been corrected.

"2. Claim 7 is allowed.

"3. Claims 1–6 are rejected as not patentable over applicant's admittedly prior art bending brake which was demonstrated to the Examiner. The instant brake differs from the prior art brake in the use of an integral hinge as opposed to an attached or separate hinge. It is well recognized in the arts that it is obvious to make two or more separate parts integral. At the recent demonstration of applicants' brake it was impressed upon the Examiner that the new and unobvious results were obtained not solely by the use of an integral hinge but from the use of an integral hinge positioned such that it's component projections did not extend above the plane of the surface of their corresponding members. Upon inclusion of such a limitation in claims 1–6, they will be allowed.

"4. Claims 1–6 are rejected."

The positioning was caused by the flat surfaces of the Marsh hinge in the plane of their corresponding members, rather than the round surfaces of the Rauen hinge which were not in a plane with their corresponding members.

The Marsh brake met with immediate commercial success. With no established

sales force, and using mailings of circulars, advertisements in trade journals, and displays at trade shows, plaintiff's total sales were about $127,000 in 1963, and $236,000 in 1964. The total combined sales of plaintiff and Van Mark of metal brakes of the Marsh patent were $356,000 in 1965, $427,000 in 1966, 519,-000 in 1967, and $692,000 in 1968.

During the period of these sales the Marsh brake was sold in competition with the prior art Rauen brake. The only substantial difference between the two brakes was the hinge. Furthermore, plaintiff sold its brake for a price which was around 38% more than the price charged for the Rauen brake.

As to the commercial success enjoyed by plaintiff, the District Court made the following observations:

> "As to the existence of the commercial success enjoyed by Tapco, the court makes two observations. To the extent that plaintiff improved on the existing bending brakes available in their market, they showed they had a useful improvement although it was unpatentable. And, inasmuch as plaintiff produced its sheet metal brake under color of patent they were bound to meet with success, due to the absence of competition."

It should not be overlooked that Van Mark was selling the patented brake in competition with plaintiff, the owner of the patent.

While commercial success will not validate a patent where invention is lacking, nevertheless in a close case where there is doubt about invention, it must be considered and may well be sufficient to tip the scales in favor of validity. Goodyear Tire & Rubber Co. v. Ray-O-Vac Co., 321 U.S. 275, 64 S.Ct. 593, 88 L.Ed. 721 (1944); General Elec. Co. v. Sciaky Bros. Inc., 304 F.2d 724 (6th Cir. 1962); Aluminum Co. of America v. Sperry Prods., 285 F.2d 911 (6th Cir. 1960), cert. denied, Firestone v. Aluminum Co. of America, 368 U.S. 890, 82 S.Ct. 139, 7 L.Ed.2d 87 (1961).

Here the invention is narrow. It is aided by the statutory presumption in favor of validity. 35 U.S.C. § 282.

Defendants could easily have avoided liability by choosing any one of many alternatives to copying the Marsh brake. Among these alternatives, defendants could have continued to use the prior art Rauen brake; they could have welded a Rauen-type hinge onto the members for greater hinge stability; or they could have used an extruded integral hinge of any design which did not adopt plaintiff's teaching to position the surface of the hinge projections flush with the plane of their corresponding member surfaces.

Furthermore, after litigation defendants made a settlement with plaintiff by taking a non-exclusive license involving substantial royalty payments. Surely they had ample time prior to making the settlement to investigate the Marsh patent and the prior art and to determine whether the improvement was obvious, whether it had utility, and whether it was achieving substantial commercial success.

Speaking of the presumption of validity, Circuit Judge Phillips, who is now Chief Judge, in Monroe Auto Equip. Co. v. Heckethorn Mfg. & Supply Co., 332 F.2d 406, 412–413 (6th Cir. 1964), said:

> " * * * [W]e also recognize that a presumption of validity attaches to a patent once it has been issued by the patent office. 35 U.S.C. § 282; Aluminum Co. of America v. Sperry Products, Inc., 285 F.2d 911, 916 (C.A.6), cert. denied, Firestone v. Aluminum Co. of America, 368 U.S. 890 [82 S.Ct. 139, 7 L.Ed.2d 87]. This is only proper because of the complexities of patent law and the expertise of the patent office. See Williams Mfg. Co. v. United Shoe Mach. Corp., 121 F.2d 273, 277 (C.A.6), cert. denied, 316 U.S. 364, 62 S.Ct. 1179, 86 L.Ed. 1537. However, the large number of patents declared invalid by the courts bear telling witness to the fact that this presumption is in no way conclusive. The presumption of course is weakened if applicable

prior art has not been considered by the patent office. Harvey v. Levine, 322 F.2d 481, 484 (C.A.6); Aluminum Co. of America v. Sperry Products, Inc., supra."

On the other hand, where the most pertinent prior art has been considered by the patent office, the presumption is greatly strengthened. Great Lakes Equip. Co. v. Fluid Sys., Inc., 217 F.2d 613, 617 (6th Cir. 1954), citing Williams Mfg. Co. v. United Shoe Mach. Corp., 121 F.2d 273, 277 (6th Cir. 1941), aff'd, 316 U.S. 364, 62 S.Ct. 1179, 86 L.Ed. 1537 (1942).

In the present case the defendants contend that the most pertinent prior art was not submitted to nor considered by the Patent Examiner. Certainly the Rauen letters patent were not submitted. On the other hand, plaintiff did submit to the patent office and demonstrated a brake of its own manufacture, which brake in all respects important to this case embodied the disclosures of the Rauen patent.

Furthermore, so far as the prior art was cited by defendant to establish the obviousness of an integral hinge, the question of whether the Noyes (992,038 [1911]), Moynahan (2,288,013 [1942] airplane wing), or Rauen patents were considered seems irrelevant since the Patent Examiner considered an integral hinge obvious to those skilled in the prior art, and disallowed claims 1–6 as originally written. In fact, the Examiner allowed claim 7 only because it described the top surface of the hinge as being flat and lying within the plane of the corresponding members' surfaces. In our opinion, the normal presumption of validity attaches, and may be "greatly strengthened" by consideration of the state of the prior art, even though the particular letters patents upon which defendants rely to establish that art, were not considered.

It should also be noted that Judge Phillips, in *Monroe*, cautioned against the use of prior patents from a "non-analogous" art. It is submitted from the above conclusion that even the Patent Examiner considered integral piano hinges obvious, and that the question of invention (which is synonymous with unobviousness) centers around whether the flat hinge top, lying in the plane of the surfaces of the corresponding members, is obvious.

On this particular question, the only pertinent prior art cited by defendant which the Patent Examiner could have considered, is the old Noyes patent which was on a blacksmith's jig for making beam-clamps. However, a substantial problem arises as to whether this is non-analogous prior art. While the Noyes patent is used for some metal bending, the metal bent is relatively narrow, thick metal bars or beams, which are heated. In fact, it appears that most of the bending is done by a hammer. While the bending level of the jig has flat fingers which could be called projections, the clamping members, unlike Marsh, have no projections, and the clamping surfaces do not lie on the same plane as the flat surfaces of the spaced fingers to which the bending handle is pivoted. The bar or anvil does not clamp the heated metal against any clamping surface. On p. 2, col. 1 of the Noyes patent, it is stated that bending lever 24 apparently does do some bending in the final step of the formation of the clamp; however, a squared corner is not desired and it does not appear that the hinge has any supporting function during the bend.

## THE TEST OF OBVIOUSNESS AND "ANALOGOUS PRIOR ART"

Obviousness is said to mean that the particular, claimed improvement would be obvious to one skilled in and knowledgeable of the "prior art". In determining obviousness or non-obviousness, the courts must make factual inquiry into the scope and content of prior art, the differences between prior art and the claims at issue, and the level of ordinary skill in the pertinent art. See generally, Graham v. John Deere Co., 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966).

Putting aside the question of whether utility could be challenged, it sems fairly clear that if there is no functional improvement made by the flat-topped hinge, then the mere use of an integral piano-type hinge would be obvious and it was so considered by the Patent Examiner. If, however, the flat-topped hinge is a functioning improvement to the prior art, then it would be patentable (so far as obviousness is concerned) unless it could be proved by defendants, with clear proof, that the prior art would suggest to a person skilled in the art the particular combination and configuration of ideas adopted by plaintiff.

The Supreme Court's treatment of the various patents-in-suit in Graham v. John Deere Co., *supra*, discloses that in discussing "obviousness" and finding the patents invalid, the Court assumed the usefulness of the claims, but found that the particular configuration chosen, even if not disclosed in any single prior patent, merely achieved a result in adoption of a principle known to the art, but achieved by a slightly different arrangement which would be obvious to anyone skilled in the art.

On the question of what constitutes "analogous" prior art, it is evident that the Supreme Court in *Graham* felt a broad reading of the term was required. *See, e. g.*, 383 U.S. at 19, 35, 86 S.Ct. 684. Thus, in the present case, the choice of "machine designing" generally (although a broad category) as the pertinent prior art, seems appropriate.

Accepting the Noyes and Moynahan patents as applicable prior art, we cannot see where the particular combination of parts to achieve a better result on a sheet metal bending brake is pointed out by the prior art. Granted, an integral hinge is not new; but under the assumption that the flat-topped "gapless" hinge contributes to achieve the result, there is only the 1911-Noyes patent cited by defendants to show "obviousness." Yet as we have previously pointed out, Noyes does not disclose the "obviousness" of the use of a flat-topped hinge to give support

to the metal as it is being bent, or to make a better bend.

Plaintiff had combined the old art piano-type integral hinge with a new type "flat, gapless" hinge not known to the prior relevant art, in such a way as to create a new, better and unsuspected result. The Marsh hinge provides greater support and prevents the sheet metal from slipping into a "gap," and thus prevents non-uniformity and marring.

The invention certainly is not dramatic, but it does not have to be so. As well stated by District Judge Jones in Squeez-A-Purse Corp. v. Stiller, 175 F. Supp. 667, 669 (N.D. Ohio 1959), aff'd, 280 F.2d 424 (6th Cir.), cert. denied, 364 U.S. 828, 81 S.Ct. 67, 5 L.Ed.2d 56 (1960):

> "It is realized and must be conceded that the defendants' article is not of striking inventive quality; it is in fact one of modest proportions, but ''tis enough, 'twill serve' as an article made up of a unique and unitary combination of old elements with new and useful elements (F and G) which constitutes a definite advance which has received universally wide acceptance and instant commercial success in its field and has contributed more than a little to its art. To this, plaintiff has added its tribute by producing and marketing an indistinguishable copy."

In Goodyear Tire & Rubber Co. v. Ray-O-Vac Co., 321 U.S. 275, 279, 64 S.Ct. 593, 594, 88 L.Ed. 721 (1944), the Court stated:

> "Viewed after the event, the means Anthony adopted seem simple and such as should have been obvious to those who worked in the field, but this is not enough to negative invention. * * * [footnote omitted]."

## UTILITY

Of course, if as the defendants contend, the flat, gapless features have no utility, then the "invention" would only be the use of an old integral piano-type hinge which everyone agrees was obvious.

Defendants have continuously argued that the flat surface of the hinge parts, lying flush in the planes of their corresponding clamping and bending members, serves absolutely no functional purpose at any time during the bend. Further the defendants have asserted that the old, separate piano hinge (where, due to a rounded hinge, a "gap" existed between the flat surfaces of each member and the point where the top of the hinge met the plane of the member surface) did not permit a slipping of the metal into the "gap" causing an uneven bend and marking of the coated surface. To establish this, defendants particularly relied upon the demonstrations made by defense counsel to the Court on bending brakes of Rauen, and of plaintiff's patented brake.

As suggested above, this would appear to challenge the usefulness of precisely that claim upon which plaintiff's patent rests; briefly, defendants challenge the utility of the patented brake. There is a substantial doubt that defendants may be permitted to do so.

■ A rule of long standing in this Circuit and still adhered to is that "one who appropriates the teachings of a patent may not deny the utility of the invention". United States Gypsum Co. v. Consolidated Expanded Metal Cos., 130 F.2d 888, 889 (6th Cir. 1942), cert. denied, 317 U.S. 698, 63 S.Ct. 441, 87 L.Ed. 558 (1943). See also, Miller v. Daybrook-Ottawa Corp., 291 F.Supp. 896 (N.D. Ohio, 1968).

■ There can be little question that defendants have copied, virtually exactly, plaintiff's bending brake. There is no question that defendants have used a piano-type integral hinge with the flat surfaces claimed by plaintiff. Thus, according to the established rule in this Circuit, it would seem that defendants may not challenge the utility of the flat surfaces which plaintiff claims as its invention.

It should be noted also that defendants' proof as to lack of utility is questionable to say the least. They claim that the demonstrations made by defense counsel discredited the explanation of Dr. Youngdahl, plaintiff's expert. However, the thrust of Youngdahl's testimony was that great additional support was given by the hinge during the bending, particularly in its final stage, without permitting the metal to slip down into a "gap" left by the hinge. Since Dr. Youngdahl's testimony was directed to the "critical" final stage as the bend approached the vertical, the demonstration by defense counsel, which embodied only partial bends, logically cannot credit nor discredit Dr. Youngdahl's testimony. Further, it is noted that one of the problems solved by plaintiff's brake was the lack of uniformity in bend along the length of the sheet metal. This difficulty was experienced particularly with respect to sheet metal bent along lengths up to several feet, whereas the bending demonstrated in court was on sheet metal no longer than one inch along the bend. It might very well be that a bend that was only one inch in length could be achieved with uniformity and without slipping, whereas a bend of a ten-foot section of sheet metal could involve entirely different pressures and forces upon it, causing lack of uniformity over its length, either through "slipping" into the "gap" or through lack of the support asserted to be afforded by the flat-topped hinge.

Although the District Court found Dr. Youngdahl's theories "plausible," he rejected them relying "most heavily" on the courtroom demonstration of a partial bend made by defendants' counsel, who was not sworn as a witness and did not qualify as an expert. As we have pointed out, the validity of this demonstration was questioned at the time. Furthermore, when plaintiff's witness, Dr. Youngdahl, who qualified as an expert, endeavored to make a demonstration in open court, the following episode took place:

"Dr. Youngdahl:

Plaintiff's Exhibit 16 is a piece of painted aluminum metal that is used on the brake, Plaintiff's Exhibit 18, to

bend up the 1″ flange I might demonstrate on the brake.

"The Court:

Don't demonstrate. I don't want to see it unless somebody wants it particularly."

No one stated that he wanted to see the test and it was not made by Dr. Youngdahl. After Dr. Youngdahl had completed his testimony and left to return to California, counsel for defendants undertook to make the questionable demonstration.

Defendants had full opportunity to offer evidence to refute the testimony of Dr. Youngdahl, but they did not do so.

It would seem to us that the demonstration by opposing counsel more properly should have been made as part of the cross-examination of Dr. Youngdahl, or at least it could have been supported by sworn testimony of witnesses with the right of plaintiff to cross-examine. The unsworn, self-serving statements of counsel are not evidence.

In our opinion, claim 7 particularly points out and distinctly claims the subject matter of the invention.

The statute provides:

"Patentability shall not be negatived by the manner in which the invention is made." 35 U.S.C. § 103.

Nor do the statutes require that an inventor understand and disclose the theory of his invention. He is entitled to all of the benefits of his invention, even though they were greater than he believed. Dellers Walker on Patents, 2d Ed. Vol. 4, § 238, pp. 106, 107.

Infringement was not made an issue in the District Court nor here.

█ In our opinion, Claim 7 of the Marsh patent is valid and was infringed by the defendants. The judgment of the District Court is reversed and the cause is remanded for further proceedings consistent with this opinion.