**Wilbur T. BOLKCOM and William E. Knapp, Plaintiffs-Appellants,**

v.

**The CARBORUNDUM COMPANY, Defendant-Appellee.**

**No. 73–1320.**

United States Court of Appeals, Sixth Circuit.

Argued Oct. 5, 1973.

Decided Sept. 30, 1975.

Rehearing and Rehearing En Banc Denied Dec. 4, 1975.

J. W. Baker, Poore, Cox, Baker, McAuley, Ray & Byrne, Knoxville, Tenn., Walter J. Blenko, Thomas L. Sivak, Blenko, Leonard & Buell, Pittsburgh, Pa., for plaintiffs-appellants.

E. Bruce Foster, Sr., Knoxville, Tenn., William H. Webb, Webb, Burden, Robinson & Webb, P. A., David C. Bruening, Pittsburgh, Pa., for defendant-appellee.

Before WEICK, McCREE and LIVELY, Circuit Judges.

McCREE, Circuit Judge.

This is an appeal from the dismissal of an action by appellants, Bolkcom and Knapp, for infringement of a combination patent protecting the invention of a novel plant for the manufacture of silicon carbide. The patent in suit is Patent Re. 27,018 (hereinafter Patent '018) dated January 5, 1971, a reissue of Patent No. 3,432,605 (hereinafter Patent '605), dated March 11, 1969. The district court held that claims 11–14, which were added by the reissue, were invalid because they were an unauthorized enlargement of the disclosures of the original patent. It also held that the claims that were carried over from the original Patent '605 to the reissue were valid, but were not infringed by the appellee's plant because it employed an element not disclosed as part of the patented combination.

We agree that the broader claims added by reissue are invalid, that the original claims are valid, and that the accused plant does not infringe the original claims. We therefore affirm.

Silicon carbide (SiC), a compound said to be second in hardness only to a diamond, is used primarily for grinding wheels, other abrasive uses, and in refractories. It is made by fusing sand and a source of carbon like coke or graphite. Silica ($SiO_2$) and Carbon (C) react under extreme heat to produce silicon carbide. After the raw materials are mixed together and placed in a furnace, an electric resistant core is fired by passing an electrical current through it to raise the charge to the extremely high temperature (about 4,000 degrees F.) necessary to achieve the reaction product, silicon carbide. Silicon carbide was first made by Edward Acheson in 1891 and he founded The Carborundum Company, which today still enjoys the largest share of the total market for silicon carbide.

A significant feature of Acheson's process is that the furnaces must be fired in close proximity to the source of electrical power because of the capital expense and power losses which result from lengthened electrical leads. Insofar as the record shows, before appellants' invention was put into practice, all manufacturers of silicon carbide in North America relied upon the use of stationary, horizontal furnaces set in banks of four to six, close to one another and to the electrical source. The firing of a charge sufficient to form silicon carbide in the Acheson process takes about thirty hours. Hand labor is used in loading and unloading the furnaces, and the cramped working conditions resulting from the close proximity of the furnaces to each other and to the electrical source made this activity difficult and dangerous. After firing, the stationary furnaces required about three days to cool before workmen could unload them and load a new charge. Typically, the four furnaces in a bank attached to an electrical source were employed in a cycle of operations, with one furnace being loaded, one charging, one cooling, and one being unloaded. The total cycle—loading, charging, cooling, and unloading—took about five to seven days for each furnace.

The recognized industry need for more efficient and economical means of manufacturing silicon carbide was described in appellants' patent as follows:

In the past silicon carbide has been manufactured in stationary electric furnaces. Such stationary furnace installations usually require four to six furnaces for each transformer in order

to utilize the transformer to its maximum efficiency, with one furnace heating, one being unloaded, one loading, and the remainder cooling. This requires very large capital investment in buildings and furnaces. The unloading of such furnaces is quite difficult and tedious because of the adjacent hot furnaces and because of the necessity of using large amounts of hand labor to remove the silicon carbide from the furnace due to the proximity of the adjacent furnaces and the difficulty of using mechanical unloading equipment in the restricted floor space available. This also requires that the furnaces be cooled [a]n extraordinary long time before unloading in order to get the temperature down to the point where the hand labor can be effectively used. A further problem arises in the loading of such furnaces because of the adjacent other furnaces. This means lengthy conveyor belts from the mixing bins to the furnaces or overhead cranes carrying successive bucket loads to the furnace.

The district court found that "[t]here has always been a need in the industry for a more facile, economical and efficient way of making silicon carbide."

To meet this need, appellants in 1964 conceived of a method of using *mobile* furnaces that could be removed from the electrical source after being fired, placed at a distance for cooling and stripping, and then moved to another area of the plant for reloading before again being moved to the electrical source for charging. Appellants' layout for manufacture also embraced the advantage of selectivity—the ability to move any furnace car for cooling, unloading, and loading, without disturbing the position of any other furnace car. This was to be accomplished by means of a "transfer car" on a set of rails transverse to the primary rails leading to the firing area and to another set of rails leading to other areas in the plant where loading and unloading operations could more efficiently be accomplished. Thus, a mobile furnace could be rolled atop the transfer car, and

the loaded car could be moved selectively in and out of alignment with the various trackways leading, on the one hand, to the firing area and, on the other hand, to the other plant areas for cooling, loading, and unloading.

Appellants successfully put their invention into practice in April 1966 by constructing their Satellite Plant at Springdale, Pennsylvania, where they began the commercial manufacture of silicon carbide. After this plant began operations, appellants' patent counsel prepared and filed the application that matured into the original Patent '605. The preferred mode of their invention was disclosed in the patent, coupled with the required detailed specification, as follows:

This invention relates to silicon carbide furnaces and plants and particularly to a silicon carbide furnace which can be fired in one position, removed to a second position for cooling and unloading and to a plant incorporating a plurality of such furnaces.

\* \* \* \* \* \*

Preferably we provide an electrical power source, a main trackway adjacent said power source, a furnace bottom mounted on wheels on said trackway movable to and away from said power source, said furnace bottom having a substantially flat heat resistant surface, removable sides along each side of said surface and removable ends on said surface, said sides and ends defining a heating chamber, electrode means in each of said ends, removable connections between said electrode ends and said power source, a transfer car movable transversely to the main trackway and having a corresponding trackway adapted to be aligned with the main trackway to receive the furnace bottom wheels and furnace whereby said furnace may be moved transversely to said main trackway, a service area spaced from said main trackway by said transfer car, secondary trackways in said service area receiving said furnace from said transfer car, loading means at said

service area adapted to load said furnace and a cooling and unloading section in said service area spaced from the loading means. Preferably the loading means is a gravity discharge hopper or the like located over a trackway adapted to receive a furnace to be loaded from the transfer car. Other loading device and conveying equipment, may of course, be used. The removable ends of said furnace are preferably provided with cooling means removably connected to a source of coolant adjacent the power source whereby the electrodes in the ends can be cooled.

Claim 1 is representative of claims 1–10 in the original patent. It states:

We claim:

1. A silicon carbide manufacturing plant comprising an electrical power source, a main trackway adjacent said power source, a furnace car movable on said trackway to and from said power source, a refractory bottom on said car, removable side and end panels on said refractory bottom of said furnace car, said side and end panels being interconnected to form a heating chamber on said car, electrode means in each end panel, removable connections between said power source and electrode means, a transfer car movable on a trackway extending transversely to the main trackway, said transfer car carrying a trackway corresponding to said main trackway and alignable with the main trackway receiving the furnace car therefrom, a service area opposite the main trackway and spaced from said main trackway by said transfer car, a secondary trackway on said service area receiving said furnace car from said transfer car trackway, loading means in the service area for loading said heating chamber while on said secondary trackway and an unloading section in said service area spaced from the loading means and receiving a completed furnace charge from said furnace car.

After putting their invention into practice in their own plant, and while their patent application was pending, in May 1967, appellants, seeking to enter into a licensing agreement, showed their plant layout to employees of appellee Carborundum Company. At least since 1965, appellee had been conducting substantial research on the feasibility of using mobile furnaces but had been unable to achieve in practice, or even in a fully developed theory, the successful result put into practice by appellants in their Satellite Plant.[1]

Thereafter, appellee proceeded to build a plant at Jacksboro, Tennessee, in which virtually all elements of appellants' manufacturing plant were duplicated, with the single exception that in appellee's Jacksboro plant, instead of a transfer car running on a track transverse to the

1. As stated in a memorandum prepared by Carborundum Company employees for internal corporate consideration:

Don Gillmore and myself visited Messrs. Knapp and Balcom [sic] of the subject Corporation on May 12 to discuss their low cost process for manufacturing silicon carbide, on which they have filed a patent application.

As we suspected, the claims are related to a car furnace operation and the savings are in lower initial capital investment plus lower labor costs primarily in material handling. *This is identical with our thinking except they have reduced it to practice in their new plant at Springdale, Pennsylvania.*

They were most frank in their discussion and gave us full details of their operation. We have copies of their patent application, a breakdown of capital costs and similar infor-

mation on labor costs. They contacted us because we are the largest producer of silicon carbide. They do not intend to contact other producers and request that we do not discuss this openly where it might become generally known to others in the trade. They anticipate it might take from two to three years for the Patent Office to rule on their application. They suggested if Carborundum were to indicate definite interest in a licensing arrangement with them it could expedite the application through the Patent Office. They are interested in the sale of a process whereby they could treat it as a capital gain. Possibly they might consider selling their Company, although we did not explore this. We did tell them our position on development of a car furnace type of plant. [Emphasis added.]

main trackways,[2] a railroad turntable supported by rails at its periphery was used.

On March 11, 1969, the original patent application was granted.

Meanwhile, by August 1969 appellants had learned that The Carborundum Company planned to build a plant at Jacksboro using a turntable to shunt mobile furnace cars selectively into and out of the firing area, and into and out of other areas of the plant. In 1969, after meeting with patent counsel to discuss the scope of their original patent, appellants filed a reissue application to cover transfer means other than the transfer car on a transverse track that was described in the initial claims. For example, it was intended by this reissue to obtain coverage for the use of turntables, ladder track, or overhead crane mechanisms in place of the transfer car. The application for reissue was filed on November 20, 1969. Appellants' patent counsel in a letter to associates engaged in obtaining foreign patents for appellants' invention stated the purpose for the reissue application in the following manner:

> Our client has just filed a reissue application in the United States on the United States patent corresponding to the above identified Canadian patent. The purpose of the reissue is to enlarge the claims. They have found that a turntable and several other mechanisms can be substituted for the transfer car of the issued claims and feel that the transfer car limitation is too limiting.

During a deposition before trial, appellant Knapp conceded that the letter re-flected the purpose of the reissue application. At trial, he qualified his answer, testifying that appellants and their counsel believed that any turntable resting on rails at its periphery was a "transfer car" within the literal meaning of their claims, and that they intended the reissue only to extend their claims to turntables rotating on a central pivot. Appellant's patent counsel testified at trial that at the time the cited letter was written, he believed that a turntable like that used by appellee was covered by the original claims, but that he wanted to write to his associates in "simplified language."

The reissue patent, '081, was granted on June 5, 1971. Typical of the new claims added, 11–14, is claim 11, which is identical to claim number 1 in substance except that it provides for achieving the desired selectivity through the use of a "transfer means" instead of a "transfer car on a track transverse to the main trackway."

Appellee's Jacksboro plant was placed in operation about April 1971 and about one year later the action for infringement was filed.

The district court held that the original claims of the patent, which expressly claim as an element of the invention a transfer car upon a transverse track, are not literally infringed by a combination virtually identical in all other respects except that it employs a turntable instead of a transfer car to achieve the selectivity function. The court found that a turntable was a "distinctly different mechanism from a transfer car," and therefore the turntable system was not

2. There was evidence indicating that appellee decided to use an old turntable instead of a transfer car in order to save about $90,000. An internal memorandum stated:

MiX 980
J. W. Golding 01–3 3 September 1968
R. C. Anderson 66–1 L. D. Schultz 66
SIC CRUDE PLANT
DEVELOPMENTS 8–26–68 to 8–30–68
 I. *H. G. Acres Co., 8–25–68*

On Thursday morning, I visited H. G. Acres and reviewed the project with Harold Rose and Jack Robson.

*The most significant development since last we met was that Jack Robson has come up with a scheme which would utilize a surplus railroad turntable in place of the transfer car previously planned. Jack and Harold estimate this could save us about $90,000.* [Emphasis added.]

equivalent to the transfer car arrangement. Further, although a turntable apparently falls within the broader reissue claims coverage of a "transfer means," the court held that reissue claims 11–14 are invalid under 35 U.S.C. § 251 because they are "not addressed to the invention disclosed in the original patent" and, instead, are an "unauthorized enlargement of the disclosures of the patent."

## THE VALIDITY OF THE ORIGINAL '605 CLAIMS

We first consider the validity of the original claims of Patent '605, which were carried over in the reissue patent. These are claims 1, 3, 4, 5, & 9. Claim 1, set forth above, is representative.

■ As we stated in *Westwood Chemical, Inc. v. Owens-Corning Fiberglass Corp.*, 445 F.2d 911 (6th Cir. 1971), *cert. denied*, 405 U.S. 917, 92 S.Ct. 941, 30 L.Ed.2d 786 (1972), there are three essential elements of patent validity: novelty, utility and non-obviousness. These requirements are codified in 35 U.S.C. §§ 101–103.

■■ In applying this test, we begin with the principle that every patent issued by the patent office carries, at the outset, a presumption of validity, 35 U.S.C. § 282, which is justified by the "complexities of patent law and the expertise of the patent office." *Monroe Auto Equipment Co. v. Heckethorne Mfg. & Supply Co.*, 332 F.2d 406, 412 (6th Cir.), *cert. denied*, 379 U.S. 888, 85 S.Ct. 160, 13 L.Ed.2d 93 (1964). And where the most pertinent prior art has been considered by the patent office, the presumption is greatly strengthened. *Tapco Products Co. v. Van Mark Products Corp.*, 446 F.2d 420 (6th Cir.), *cert. denied*, 404 U.S. 986, 92 S.Ct. 451, 30 L.Ed.2d 370 (1971). *See also Great Lakes Equipment Co. v. Fluid Systems, Inc.*, 217 F.2d 613, 617 (6th Cir. 1954). Conversely, "where applicable prior art has not been considered by the Patent Office this presumption is greatly weakened." *Dunlop Company, Ltd. v. Kelsey-Hayes Co.*, 484 F.2d 407, 413 (6th Cir. 1973), *cert. denied*, 415 U.S. 917, 94 S.Ct. 1414, 39 L.Ed.2d 471 (1974), *Monroe Auto Equipment Co., supra*.

Here, appellee, in challenging the validity of the original patent, cites as relevant prior art not considered by the Patent Office six patents, and two confidential inter-corporate reports circulated by its employees. Moreover, appellee contends that this prior art is more pertinent to the patent claims in issue than that considered by the patent office, because the examiner did not consider any patents concerned with mobile silicon carbide furnaces.

## PRIOR ART

The following prior art not considered by the Patent Office was cited by appellee.

### 1. Bayard Patent No. 1,107,478.

The Bayard patent relates to a plant for the manufacture of silicon carbide having moveable electric furnaces. It shows two parallel batteries of eight furnaces each, mounted on wheels for movement along trackways from a furnacing area to a service area. Each furnace has removable end walls equipped with electrodes. Before a battery of furnaces can be moved, the end walls must be removed from all eight furnaces and replaced with false end walls. Further, the electrical wiring system requires all furnaces in a battery to be operating at the same time. The trackways leading to the firing area permit the furnaces to be moved outside for cooling, emptying, and loading a new charge. While one battery of furnaces is being serviced, the other can be charged.

### 2. German Patent No. 854,207 (hereinafter Demag).

The Demag patent likewise pertains to a plant for the manufacture of silicon carbide in moveable electrical resistance furnaces. Wheeled frames or trucks carry the vertical furnaces, which are made up of separate wall sections clamped or hinged together during

charging or firing. The furnaces are in groups of three, which must be used simultaneously. The groups of furnaces move on a frame or truck over a trackway to the electrical source, then back down the tracks to a turntable where they are positioned to move onto tracks leading to the servicing area.

### 3. Tone Patent No. 800,515.

This patent is directed to an electrical resistance furnace for making silicon carbide, graphite, siloxicon, and for heating other carbon articles. The furnace has removable sidewall panels composed of bricks held together by frames of iron or other materials. The panels rest on the furnace floor when in position and are withdrawn by a crane at the end of a furnace run.

### 4. Van Wagenen Patent No. 492,069.

This patent shows a turntable having wheels located at its periphery which ride on a track as the turntable rotates.

### 5. Koppers Patent No. 1,674,985.

This patent relates to a furnacing plant for burning fireproof ware. It shows a preheating channel, furnaces, and cooling chambers connected by tracks, with cars that move on the tracks, sliding platforms, and transversely extending trackways on which the sliding platforms move.

### 6. Lloyd Patent No. 2,504,707.

This patent shows a plant for heating ingots for the manufacture of steel using transfer cars and tracks extending transversely to the main furnace trackway.

 Appellees also rely upon two Carborundum Company internal memoranda regarding plans for mobile silicon carbide furnaces.[3] However, there was no showing that these two proposals were ever reduced to practice prior to the construction of appellants' plant. In *Monroe Auto Equipment, supra,* we held that in order to anticipate an invention, prior art "must have been reduced to use and successfully performed." 332 F.2d 415. More recently, in *Dunlop Co., Ltd. v. Kelsey-Hayes Co., supra,* we reiterated this holding with the qualification that even though imperfections and commercial difficulties may be revealed by reduction to practice, a device may nevertheless qualify as prior art. Therefore, since the proposals in the Carborundum Company memoranda were never put into practice, they cannot be considered as anticipating the '605 patent.

## UTILITY AND NOVELTY

 The utility and novelty of appellants' invention is demonstrated by the undisputed need of the industry for a plant layout that would permit the continuous operation of the manufacturing process by the selective movement of furnaces throughout its phases, and by the commercial success of appellants' plant. William Bolkcom's deposition testimony indicated that appellants' silicon carbide accounted for 8–10 percent of the total output in the United States and Canada.

 Moreover, the fact that the elements included in appellants' combination patent were found individually in prior art devices does not defeat novelty. *King-Seeley Thermos Co. v. Refrigerated Dispensers, Inc.,* 354 F.2d 533 (10th Cir. 1965). As the court stated in *Shaw v. E.B. & A.B. Whiting Co.,* 417 F.2d 1097, 1101 (2d Cir.), *cert. denied,* 397 U.S. 1076, 90 S.Ct. 1518, 25 L.Ed.2d 811 (1970):

**3.** The Carborundum proposal dated 1956 describes a silicon carbide plant having moveable furnace cars each of which is to be moved by a "transfer mechanism" from a loading area to a furnacing area. The furnaces pass through the furnacing area to another "transfer mechanism" which moves them through a cooling area to tracks passing through an unloading area.

The June 1965 Carborundum proposal describes a mobile furnace plant where furnace cars travel on tracks and are moved in a direction transverse to these tracks on transfer tracks through the various phases of silicon carbide manufacture. The "mobile furnace plant" was one of fourteen new concepts described in the report.

However, the fact that each element of a creation sought to be patented is found in prior art does not negate novelty if the old elements are combined in such a way that as a result of the combining an improved, useful, and more advantageous innovation is obtained.

## NON–OBVIOUSNESS

We turn next to the more difficult question whether within the meaning of 35 U.S.C. § 103 appellants' invention was obvious. Section 103 provides:

A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, *if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.* Patentability shall not be negatived by the manner in which the invention was made. [Emphasis added.]

Appellee argues that the claimed invention was obvious in view of the prior art, particularly because it was a mere aggregation of old elements.

In *Graham v. John Deere Co.,* 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966) the Supreme Court interpreted the section 103 standard of "obviousness" as intended to codify the prior judicial standard of "invention." The Court gave obviousness a practical definition:

Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding

the origin of the subject matter sought to be patented. As indicia of obviousness or nonobviousness, these inquiries may have relevancy. See Note, Subtests of "Nonobviousness": A Nontechnical Approach to Patent Validity, 112 U.Pa.L.Rev. 1169 (1964). 383 U.S. 17–18, 86 S.Ct. 694.

■ Further, in considering cases dealing specifically, with inventions that combine elements that were known as part of the prior art, the Supreme Court has developed some specialized criteria for obviousness. In *Great A & P Tea Co. v. Supermarket Equipment Corp.,* 340 U.S. 147, 150, 71 S.Ct. 127, 129, 95 L.Ed. 162 (1950), Justice Jackson writing for the Court, cautioned that the "concept of invention is inherently elusive when applied to combination of old elements." A claimed invention is not patentable if it is a mere aggregation of old elements assembled with only mechanical skill. In order to be patentable a combination must produce a new result or a different function; the new invention must be more than the sum of the old parts. *Anderson-Black Rock, Inc. v. Pavement Salvage Co., Inc.,* 396 U.S. 57, 90 S.Ct. 305, 24 L.Ed.2d 258 (1969); *Great A & P Tea Co. v. Supermarket Equipment Corp.,* 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162 (1950); *Grinnell Washing Machine Co. v. E. E. Johnson Co.,* 247 U.S. 426, 38 S.Ct. 547, 62 L.Ed. 1196 (1918).

The district court found that the '605 patent was not obvious on consideration of the prior art. The court found that although the prior art disclosed the concepts of moveable furnaces, transfer cars, and other elements used in the '605 patent, the novel combination invented by appellants produced the new result of facile and unencumbered selectivity. In contrast, appellee's unsuccessful attempts to design a mobile furnace were simply obvious combinations or aggregations of known elements. The court observed that despite appellee's hindsight argument that the '605 patent was obvious, nevertheless, its own experts, who devoted years of effort, failed to achieve

an equivalent result. In summary, the district court specifically found that appellants' claimed invention was not a mere aggregation of old elements, but instead it was "a combination in which the product exceeds the sum of the individual elements," producing a new result of selectivity. This new selectivity was a small but significant advance over the prior art in a relatively crowded field.

■ We agree with the district court that the '605 patent was not obvious. The Bayard and Demag patents both lacked the element of selectivity. The Bayard patent showed furnaces in batteries of eight, and all eight furnaces had to be operated at the same time; further, all eight end walls from the entire battery had to be removed and replaced by false end walls before the individual furnaces could be moved away to the stripping area. The Demag patent differs significantly from appellants' because it shows vertical, not horizontal, furnaces, arranged in groups of three which had to be moved as single units. The Tone, Van Wagenen, Koppers, and Lloyd patents simply show that the individual elements of removable furnace side walls, turntables, and transfer cars on transverse tracks were part of the prior art. They fail to show that appellants' combination of these elements, and others, was obvious.

We agree with the district court that appellants' invention was more than a mere aggregation of old elements. The new result of selectivity was a significant advance over the prior art. It was precisely the element of selectivity that made appellants' plant such a commercial success, solving an industry-wide problem.

■ Moreover, the secondary considerations enumerated by the Supreme Court in *Graham v. John Deere* all strongly support the conclusion that appellants' invention was not obvious. The appellants' plant was a commercial success that had captured 8–10 percent of the North American market for silicon carbide. It met the longstanding industry need that inspired appellee's own research efforts beginning as early as 1950. Finally, appellee's failure, despite its preeminence in the field, to duplicate appellants' invention after years of sustained effort strongly supports the district court's conclusion that the invention was not obvious to a person with only ordinary skill in the art. We agree with appellee that the result of increased efficiency from a mere mechanical aggregation of old elements is not patentable. But here, because the claimed invention is greater than the sum of its parts and produces a new result, the secondary considerations mentioned in *Graham v. John Deere,* including commercial success resulting from greatly increased efficiency, are relevant.

■ Since we hold that appellants' original '605 patent satisfies the requirements of novelty, utility, and non-obviousness, we agree with the district court that the original patent is valid.

## THE VALIDITY OF THE REISSUE CLAIMS 11–14

The district court found the reissue claims 11–14 are invalid as an "unauthorized enlargement of the disclosure in the patent." Appellants contend that the disclosure of an invention in the preferred form or "best mode" should not prevent the inventor from claiming every form in which the invention might be copied.

We agree that the trial court applied the proper standard in determining whether the reissue claims were valid. 35 U.S.C. § 251 provides in part:

Whenever any patent is, through error without any deceptive intention, deemed wholly or partly inoperative or invalid, by reason of a defective specification or drawing, or by reason of the patentee claiming more or less than he had a right to claim in the patent, the Commissioner shall, on the surrender of such patent and the payment of the fee required by law, reissue the patent for the invention disclosed in the original patent, and in accordance with a new and amended

application, for the unexpired part of the term of the original patent. *No new matter shall be introduced into the application for reissue.* [Emphasis added.]

The Supreme Court has made it clear that this section is intended only to permit the reissue of a new patent for *the same invention* as that disclosed in the original patent in order to permit the correction of an innocent inadvertent defect or omission. It is not intended to permit the patentee to broaden the claims of the original patent. The new description of claims may not properly include

> additions to the invention which were not described, suggested, nor substantially indicated in the original specifications, drawings, or patent-office model. . . . Letters patent reissued for an invention substantially different from that embodied in the original patent are void and of no effect . . . . *Parker and Whipple Co. v. Yale Lock Co.,* 123 U.S. 87, 97–99, 8 S.Ct. 38, 44, 31 L.Ed. 100 (1887).

For example, in *U. S. Industrial Chemicals, Inc. v. Carbon Carbide & Chemicals Corp.,* 315 U.S. 668, 678, 62 S.Ct. 839, 86 L.Ed. 1105 (1942) the Court held that:

> the omission from a reissue patent of one of the steps or elements prescribed in the original, thus broadening the claims to cover a new and different combination, renders the reissue void, even though the result attained is the same as that brought about by following the process claimed in the original patent.

Bolkcom acknowledged at his deposition, and Knapp at trial, that the original patent referred only to a transfer car, but they contended that the claim includes a turntable with wheels located at its periphery. They also conceded that they intended the reissue to cover other transfer means, such as a ladder track or a turntable rotating on a central pivot. This concession is consistent with their letter to foreign associates, *supra,* in which patent counsel described

the purpose of the reissue as "to enlarge the claims."

We hold that the record clearly supports the district court's conclusion that the claims added in the reissue patent were invalid because they were an unauthorized enlargement of the disclosure in the original patent. The reissue claims, like those in *U. S. Industrial Chemicals,* were intended to broaden the claims in order to cover several new and different combinations. Therefore, as in *U. S. Industrial Chemicals,* the reissue is void even though the combinations using the other transfer means achieved the same result as appellants' original invention.

## INFRINGEMENT

Since we have already held that the district court was correct in determining that the original patent is valid and the reissue claims are invalid, we now turn to the claims of the original patent to determine whether it was infringed by appellee's plant. The district court found that the appellee's plant, although virtually identical with appellants' in every other respect, utilized a turntable instead of a transfer car to transport mobile furnaces. It found that the turntable was not a transfer car, and did not accomplish substantially the same results by substantially the same means. Instead, it found that the turntable is "an essentially different means" that is "not the equivalent" of appellants' invention.

Appellants argue that appellee's combination, including a turntable, infringes their original patent both literally and under the doctrine of equivalents. Considering first the argument that there was a literal infringement of the original patent, we are not persuaded that a "turntable" is included within the definition of a "transfer car." Not only was there testimony that appellee's device is commonly referred to in the art as a turntable, rather than as a car, but also there was testimony that a transfer car can move from one location to another, but a turntable has a fixed location and merely rotates around a central pivot.

However, under the doctrine of equivalents, appellee's plant must also be found to infringe if the turntable and the transfer car do substantially the same work in substantially the same way and accomplish substantially the same result. *Graver Tank & Mfg. Co., Inc. v. Linde Air Products,* 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097 (1950). The *Graver* Court stated that this doctrine is available to the holders of combination patents as well as primary patents, and the area of equivalence will vary under the circumstances of individual cases, the prior art, and the context of the patent. It also held that the existence of equivalence is a question of fact.

Applying this test, we hold that the district court's finding of fact that appellee's turntable was not the equivalent of the transfer car used in appellants' plant is not clearly erroneous. The turntable does perform substantially the same function as the transfer car: each serves as the device that moves the mobile furnaces into alignment with the main trackway leading to the firing area, then out of alignment with that trackway and into alignment with other trackways to the stripping and loading areas. However, the way in which the turntable accomplishes this result differs from that of the transfer car. As observed above, the turntable itself is stationary and transfers the furnaces by pivoting around a central point, but the transfer car can move them about from location to location. Important practical consequences may result from this difference. For example, the number of separate locations which can be served by the turntable may be limited by the number of tracks that can abut its circumference. Also, a number of transfer cars carrying furnaces can move about simultaneously on various portions of appellants' trackways. However, it would appear that only one furnace at a time can be transferred by the turntable.

Where the patent is a pioneer, the patentee is allowed to claim a wide range of equivalents. But where, as here, the patent represents only a small but significant advance because the art is crowded, the doctrine of equivalents is given a correspondingly narrow range. *Triax Co. v. Hartman Metal Fabricators, Inc.,* 479 F.2d 951 (2d Cir.), *cert. denied,* 414 U.S. 1113, 94 S.Ct. 843, 38 L.Ed.2d 740 (1973), *Parmalee Pharmaceutical Co. v. Zinc,* 285 F.2d 465 (8th Cir. 1961).

In view of our holding that appellee's plant does not infringe under the doctrine of equivalents, we do not reach appellee's additional argument that file wrapper estoppel would also preclude a finding of infringement because in the prosecution of the patent in suit the inventors narrowly restricted the scope of their claims.

Affirmed.