## HENDERSON et al. v. WELCH DRY KILN CO., Inc.

District Court, E. D. Louisiana.    June 6, 1928.

No. 18840.

1. Patents ⬡178—Combination patent, covering old elements and making but slight advance in art, held entitled to very narrow range of equivalents.

Combination patent, covering well-known elements previously used in the art, making but slight improvement in method, and producing same result, *held* entitled to very narrow range of equivalents.

2. Patents ⬡112(4)—Allowance of patent by Patent Office after withdrawing reference to other patent creates presumption of substantial difference.

Allowance of alleged infringing patent by Patent Office after the withdrawing of specific reference to alleged infringed patent raises presumption of substantial difference between such patents.

3. Patents ⬡328—1,422,202, for improvements in dry kilns for drying lumber, held not infringed.

Henderson patent, No. 1,422,202, for improvements in dry kilns, designed for drying lumber, *held* not infringed.

4. Patents ⬡226—Defendant's device may be within language of claim, and not be infringement.

A defendant's device may be within the language of a patent claim, and not be an infringement; an infringement not being mere matter of words.

5. Patents ⬡167(2)—Patentees will not be permitted to extend claim restricting patent to certain type by words "substantially as and for the purpose described."

Under combination patent, making slight improvement in the art and restricting them to certain type of device, patentees will not be permitted to extend or expand their claim over the limitation expressed therein by concluding clause, "substantially as and for the purpose described"; such words confining invention within purposes and operation therein specified.

In Equity. Patent infringement suit by Nelson H. Henderson and another against the Welch Dry Kiln Company, Inc. Decree for defendant.

John D. Miller, of Miller, Miller & Fletchinger, of New Orleans, La., and Eugene A. Thompson, of Syracuse, N. Y., for complainants.

Dean S. Edmonds and Merton W. Sage (of Pennie, Davis, Marvin & Edmonds), both of New York City, and John E. Jackson, of New Orleans, La., for respondent.

BURNS, District Judge. Plaintiffs' bill of complaint alleges infringement by defendant of their United States patent No. 1,422,202 for improvements in dry kilns designed for drying lumber. Their letters patent, dated July 11, 1922, called hereinafter the Henderson patent, comprise some 30 claims, but the plaintiffs elect to stand upon the alleged infringement of claim 4.

Defendants deny infringement, allege invalidity, and plead estoppel by conduct in bar of plaintiffs' suit. Its kilns are built under United States patent No. 1,517,928, dated December 2, 1924, hereinafter called the Welch patent.

The specifications of the Henderson patent in suit sets forth their invention as follows:

"This invention relates to dry kilns of the class used for drying lumber and other wood products, coats of paint, varnish, etc., on articles as the so-called siccative coatings, enamel on leather, etc., and has for its object construction and means for effecting and controlling the circulation of the atmosphere of the kiln and the taking in and humidifying of outer air and also the recirculating of the atmosphere in the kiln, which kiln is particularly simple in construction and especially economical to operate.

"This kiln comprises, generally, a drying room, and a heating chamber below the drying room in communication therewith, and a steam injector arranged to circulate the atmosphere in the kiln and to maintain the humidity of the atmosphere, and also to draw in, humidify, and circulate outside air and to create a draft in the stacks."

"Owing to the use of the injectors, a positive circulation is maintained in the kiln and also in the stacks, and the medium used to maintain the circulation also supplies the moisture for effecting the drying of the lumber or coatings; hence the injector performs the functions of maintaining the circulation, humidifying the atmosphere, and creating the draft in the stacks. Hence this kiln is more economical in operation than when fans and other mechanical blowers for circulating the atmosphere are employed, or when the draft is maintained in the stacks by the use of additional coils or draft-producing devices in the stacks."

Claim 4 of the patent reads:

"A dry kiln having a circulating passage having an inlet into the interior of the kiln, an air inlet communicating with the circulating passage and with the outside of the kiln, and an outlet into the kiln, and a steam blower arranged in the circulating passage between said inlets and said outlet in position to recirculate the atmosphere of the kiln and also draw in air through the air inlet and humidify the same, substantially as and for the purpose described."

I find that the claim in suit reads equally as well upon the defendant's device as it reads upon the plaintiffs'. This is because both inventions comprise the same five mechanical elements, all of which are old devices, in combination; the inventions consisting in slight improvements in structure, but with a different means or method of functioning, yet producing the same result.

The prior state of the art, upon which but slight advance was made by Henderson, appears by reference to the patents of Rubin, Emerson, and Cutler, and the documents of Brownlee.

The Rubin patent, No. 1,281,212, dated October 18, 1918, is almost identical with the Henderson patent, except for specific details in construction. Both are compartment kilns, with transverse circulation within.

The Cutler patent, No. 1,341,884, is also a compartment kiln with transverse circulation, operated in the same manner as Henderson. The principal difference is that Cutler employs fans for circulation; but both

fans and steam injectors have long been recognized as equivalents in the art. (To this effect, vide British patent of Norton, No. 890 of 1863; British patent of Barff and Kidd, No. 971 of 1874; United States patent to Reyscher, No. 743,196 of 1903; British patent to Oxley, No. 28079 of 1907. The use of steam jets goes back to 1877. United States patent to Curran, No. 189,-432.)

The Emerson British patent, No. 24584 of 1894, is also almost identical with Henderson. It is a compartment kiln with transverse circulation, to which Henderson seems only to have added steam jets or injectors, set in the multiple transverse ducts to draw in fresh air, humidify it, and circulate it.

The Brownlee kiln, though not patented, embodies every element of Henderson, being a compartment kiln with transverse circulation reading on every detail of claim. This prior invention and prior knowledge of Brownlee is established by his drawings and description on file in the laboratory of the Forest Products Bureau of the United States Department of Agriculture, which is open to public inspection.

In my view of the case it is unnecessary to consider the validity of the patent in suit with reference to these probable anticipations; nor is it necessary to consider the defense of estoppel, predicated on correspondence between these parties. The case of infringement may readily be disposed of on the merits, which should suffice.

[1] In view of the prior state of the art, Henderson's patent is entitled to a very narrow range of equivalents, because it is, as stated, a combination of well-known elements, which have been used almost continuously in the art, which dates back some 50 or more years. The Henderson patent was applied for May 14, 1921, and granted July 14, 1922. The Welch patent was applied for July 19, 1922, and granted December 2, 1924.

The Patent Office, in considering Welch, cited Henderson against two of Welch's claims; but the reference was withdrawn when the Patent Office concluded that Henderson's patent was for a compartment kiln, whereas the Welch patent was for a progressive kiln. The case turns upon this point for decision.

The evidence is that the Henderson dry kiln business is more or less local to New York and the adjoining states, and is and has been confined to the drying of hardwoods by the compartment kiln method; whereas the Welch Company's dry kiln business is more or less local to Louisiana and adjoin-

ing Southern states, and has been confined to the drying of pine and soft woods by the progressive kiln method.

A significant letter, written by Henderson to the Welch Company November 21, 1925, reads in part: "Although we have not entered the Southern drying field where the progressive kiln for yellow pine is in common use, we may do so in the near future. Up to date we have been mainly concerned in manufacturing compartment kilns for drying of hardwoods."

The Hendersons had otherwise recognized the difference between the compartment, or single charge, or box kiln, as the type is variously called, and the progressive kiln; that in the compartment kiln, during process, the temperature throughout the entire kiln is periodically raised, and the humidity throughout the entire kiln is periodically lowered, until at the end of the drying period the conditions throughout the kiln as to both humidity and temperature correspond, whereas in the progressive kiln, during process, the temperature and humidity is variable throughout its length. In the compartment kiln the air circulation is transverse of the kiln, whilst in the progressive kiln the air circulation is longitudinal thereof.

This requirement of maintaining variability in the progressive kiln, and uniformity in the compartment kiln, leads to distinctly different types of construction and distinctly different modes of operation or functioning. The air in any dry kiln must be kept in constant motion; otherwise stagnant areas will occur, and where this occurs it is derogatory to proper drying. In the Henderson kiln the transverse air circulation is affected by a series or plurality of transverse circulation passages, about 4 feet apart; whereas the longitudinal circulation of Welch is accomplished by two longitudinal by-pass conduits, through which the warm moist air is moved from the wet or green end to the dry end. These are but two in number, positioned parallel at opposite sides of the kiln.

Stripped of all argument predicated on the fact that claim 4 reads as well on Welch's structure as it does on Henderson's—i. e., that the Welch device corresponds with the letter of Henderson's claim—the contention is that the Henderson claim reads equally as well on Welch's commercial structure, in that Welch uses a steam blower in the recirculating passages and that his fresh air intake is the equivalent of Henderson's element 3: "An air inlet communicating with the circulating passage and with the outside of the kiln." The answer is that cold or fresh air rushes of its own accord into the Welch inlet, because it is functionally different than anything disclosed in Henderson, who must employ a steam injector or equivalent means in every one of his transverse circulating passages (four feet apart) in order to overcome frequent right angle friction, so as to distribute fresh air uniformly across the length of his kiln; whereas the injector in the Welch kiln is used primarily to speed up the circulation and draw warm, moist air into his by-pass conduit. Moreover, either might have used fans as well. Both steam injectors and fans have long been recognized mechanical equivalents, used in kilns for the same purpose.

Welch's advantage is that he gets all the necessary fresh air to his by-pass conduit by air density differences inside the kiln. The evidence is that sometimes he gets too much fresh air from the mere leakage of the kiln doors, so that a damper must be used to shut it out; whereas Henderson must have a plurality of steam jet injectors to draw fresh air from his longitudinal inlet into each of the plurality of laterally disposed transverse ducts.

In the correspondence leading up to this suit, a letter from Welch to Henderson (December 3, 1925) clarifies this point:

"If you will refer to our patent under which we operate, you will find that our kiln is decidedly different from your kiln. It is necessary in your kiln to use a steam jet to suck in the fresh air at each opening, in order to get the proper distribution; whereas in our kiln the entering air acts to cause a recirculation, and does not need any steam jet to suck it into the kiln. As you know, outside air enters into a hot room at a very high velocity, and by means of our duct design we utilize this velocity to suck the hot moist air from the green end and deliver it under the lumber at the dry end. This is something that you could not do with your type of kiln."

Moreover, Welch does not use the steam spray injector in the by-pass, either for adding humidity to the atmosphere or for drawing air into the kiln. The humidity is provided by a plurality of overhead steam sprays, described in the Welch patent as follows:

"Provision is made for spraying live steam into the drying chamber at both the dry and wet ends, in order to provide the requisite heat and humidity for performing the drying operation. For this purpose spray nozzles 28 and 30, fed by steam lines 34, 36, are positioned at the desired points, as shown in Figs. 1, 4 and 5. The steam lines

are provided with the usual control valves *38*, so that both the heat and humidity within the kiln at the different points thereof may be controlled by the operator."

His steam injectors in the by-pass conduits are provided solely to increase the velocity of circulation.

[2] However, I cannot pretermit the presumption raised that there is a substantial difference between the two patents, because of the allowance of the Welch patent by the Patent Office after withdrawing the specific reference to Henderson, as hereinabove recited, but I take it into consideration in determining whether or not there is an infringement. Reis v. Rosenfeld (C. C. A.) 204 F. 282; Bliss v. Spangler (C. C. A.) 217 F. 394; Leader Plow Co. v. Bridgewater Plow Co. (C. C. A.) 237 F. 376; Meurer Steel Barrel Co. v. Draper Mfg. Co. (D. C.) 260 F. 410, and the citations of authority in each of these.

I take the evidence as showing conclusively that the Henderson invention was but an improvement in compartment or charge kilns, and also conclude upon the evidence that, being a compartment, it could not, by method of operation, be used commercially as a substitute for the progressive method. Bulletin No. 1136, U. S. Department of Agriculture, "Kiln Drying Handbook," by Rolf Thelen, defines the difference in type:

"Dry kilns for wood may be grouped in two general classes, commonly known as progressive and compartment. Progressive, kilns are sometimes called 'continuous' kilns, and compartment kilns are known as 'box' or 'charge' kilns. The differences between the two types depend on the method of handling the stock through the kiln. In the progressive kiln (Fig. 6), the stock enters at one end and moves progressively through to the other end, emerging, presumably dry, at the proper time. The stock is fed in and removed periodically, and the process is continuous. In the compartment kiln the entire kiln is loaded at one time, and the charge remains in place throughout the drying period. In the progressive kiln the temperature and humidity at any point remain constant, but the kiln is hotter and drier at the discharge end than at the receiving end; in the compartment kiln the temperature and humidity are as nearly uniform as possible throughout the kiln at any given time, and are changed from time to time as the stock dries."

It is in evidence (Perry witness) that compartment (box or single charge) kilns are not practicable for maintenance of uniformity without special devices, when they are larger than 50 by 20 feet; whereas the progressive type is of tunnel shape, never under 100 feet long, generally 125 to 150 feet long, and he has known some 250 feet long.

H. D. Tiemann, a recognized authority and inventor, in "The Kiln Drying of Lumber," p. 30 (published in 1917), classifies the types much the same as Thelen, specifying that the logical classification should be according to the fundamental principles on which they operate, or the process of drying.

Finally, one of the plaintiff brothers (H. L. Henderson) wrote a book, "Dry Kiln Practice," published in 1925, prior to the inception of this controversy, which seems to destroy the main argument of his solicitor. In this book he gives full recognition to the authoritative classification of types recognized in the art.[1]

---

[1] Dry Kiln Practice—Types of Kilns.
Progressive Kilns.

Kilns are segregated into two general classes or groups; i. e., progressive and compartment. In a *progressive* kiln the green or entering end is warm and humid and the dry or leaving end is hot and dry. All the lumber enters at the warm, humid end, moving towards the dry end a certain distance each day, passing into drier and less humid conditions, until the opposite end is reached. The lumber has been subjected to all the necessary drying conditions of temperature and humidity, by moving it into areas where these conditions prevail. They occur simultaneously throughout the kiln, by having a current of air moving continuously from the hot, dry end of the kiln towards the opposite. This hot, dry air, striking the lumber, cools as it takes up moisture from the lumber, so that by the time it reaches the other end it has cooled appreciably and the relative humidity raised, and drying conditions are suitable for the green lumber. Part of this air goes out the stacks and the remainder recirculated.

In order to obtain the necessary drop in temerature and rise in relative humidity, the kiln must be of the proper length. Experience has demonstrated that kilns must be at least 100 feet long to operate successfully as a progressive type and greater lengths are recommended.

Uses for Progressive Kilns.—It is difficult to maintain any uniform set of drying conditions in a progressive kiln, so that it is used primarily with soft woods, such as Southern pine, and West Coast woods, such as Douglas fir, hemlock, cedar, and pine, which dry much faster and easier than the hardwoods. Some progressive driers are used for redrying hardwoods, where available plant space does not permit the installation of compartment kilns.

Compartment Kilns.

A compartment kiln is completely charged with lumber at one time and the drying conditions are kept the same all over the kiln. The lumber is first subjected to warm humid air until it has dried sufficiently to permit more severe conditions. The temperature is raised and the humidity lowered, and this process is con-

It appears, moreover, that before Welch provided the longitudinal by-pass of his kiln—a conduit some two feet square and approximately 100 feet long, extending lengthwise along the bottom of the kiln—he had investigated the actual internal circulation conditions. This conduit receives warm, moist air from the green end of the kiln and conveys it to the dry end, where needed to compensate the deficit of moisture there. It resulted from Welch's discovery, by personal investigation and tests inside of operating kilns, that, contrary to the circulation theory upon which Henderson and all others in the prior art had proceeded, progressive kilns had in fact an excess of humidity or moisture at the green end and a deficit at the dry; that the mere air density and temperature differences inside the kiln were not of themselves sufficient to transfer the excess of moist, warm air longitudinally from the cool, wet end to the hot, dry end.

[3, 4] My conclusion, therefore, is that the charge of infringement is not proven, notwithstanding the Welch structure corresponds with the letter of Henderson claim 4. An abundance of authority sustains the point that a defendant's device may be within the language of a claim and not be an infringement; that an infringement is not a mere matter of words. General Electric Co. v. Allis-Chalmers Co., 178 F. 273, 276 (3 C. C. A.); Id. (C. C.) 171 F. 666, 669, citing Westinghouse v. Boyden, 170 U. S. 537, 18 S. Ct. 707, 42 L. Ed. 1136.

The distinction in types between progressive and compartment kilns, recognized by the Patent Office and in the art generally, in the light of the evidence, suffices to sustain the conclusion that, whilst the same five elements are found in both Henderson and Welch, they operate functionally in a manner so different that there is a total absence of equivalency.

[5] The plaintiffs ought not be permitted to extend or expand their claim 4, which re-

tinued until the end of the drying period, when the air will be hot and dry.

Uses of Compartment Kilns.—Due to its flexibility of control of drying conditions and the feasibility of building it in any size desirable, the compartment kiln has come into more general use than the progressive type. A progressive kiln, in order to give maximum results, must be designed especially for the species and thickness of lumber it is to dry, while a compartment type can be used for any species, thicknesses, or any dryness of lumber that is desired.

From volume XXV, July, 1925, number 7b, Bulletin No. 16 of the New York State College of Forestry at Syracuse University, Dry Kiln Practice, by H. L. Henderson.

stricts them to the compartment type of kiln, over the limitation expressed therein by the concluding clause, "substantially as and for the purpose described." Robinson on Patents (volume 2, p. 131) says these are words of limitation in a claim, and should not be used unless they are intended to have their special signification. Judge Carpenter, in Campbell v. Marsden (C. C.) 64 F. 782, concluded that the final result of all the decisions on this point was that these general words are to be construed as efficacious to impart a limitation ascertainable from the specifications. Likewise Campbell v. Duplex (C. C.) 86 F. 315, 334, found that the phrase confines the invention within the purposes and operation therein specified. It seems plain to me that the Henderson patent should be held confined, upon this consideration alone, to the compartment type of kiln, such as cannot be infringed by Welch's progressive type, because of the lack of equivalency in the element of function, and thus restricted as to make it commensurate to the contribution made by them to the art of dry kiln construction. Simmons v. Southern, 140 F. 606 (5 C. C. A.).

I have said the Henderson patent was entitled to a very narrow and limited range of mechanical equivalents, because of its slight improvement on old devices or combinations of the same elements performing the same function after as before the improvement, so that those who use only the very device or improvement, or mere colorable evasions thereof, might be held to infringe. I have in mind the rule stated in National Hollow Brake-Beam Co. et al. v. Interchangeable Brake-Beam Co. (C. C. A.) 106 F. 710, or the same rule as stated in Noonan v. Chester Park Athletic Club (C. C. A.) 99 F. 90, which might be read with direct reference to the patent in suit: "The structure resulting from the combination of elements was one which involved little more than ordinary mechanical skill. * * * His patents must rest upon the novelty of the specific combination of means to carry his idea into practical application. He is not entitled to a monopoly of analogous means found in the old art. Subsequent improvers are equally free to accomplish the same general result by different means, if not purely colorable changes. The range of equivalents allowable to the combination must be so narrowed as to include nothing which is not substantially identical with the means employed by Thompson [Henderson here]"—citing Knapp v. Morss, 150 U. S. 221, 14 S. Ct. 81, 37 L. Ed. 1059; Wright & Colton Wire-Cloth Co. v. Clinton

Wire-Cloth Co. (C. C. A.) 67 F. 790; Wells v. Curtis (C. C. A.) 66 F. 318.

A decree may accordingly be entered in favor of defendant, with costs.