The NATIONAL ROLLED THREAD DIE COMPANY, Plaintiff-Appellant,

v.

E. W. FERRY SCREW PRODUCTS, INC., et al., Defendants-Appellees.

The NATIONAL ROLLED THREAD DIE COMPANY, Plaintiff-Cross-Appellee.

v.

E. W. FERRY SCREW PRODUCTS, INC., et al., Defendants-Cross-Appellants.

Nos. 75–2010, 75–2011.

United States Court of Appeals, Sixth Circuit.

Argued June 22, 1976.

Decided Sept. 1, 1976.

Rehearing Denied Oct. 12, 1976.

William C. McCoy, Jr., Bosworth, Sessions & McCoy, Stephen A. Hill, Cleveland, Ohio, for National Roller Thread Die Co.

William A. Gail, McNenny, Farrington, Pearne & Gordon, Charles B. Gordon, Cleveland, Ohio, for E. W. Ferry Screw Products, Inc., et al.

Before PHILLIPS, Chief Judge, and LIVELY and ENGEL, Circuit Judges.

PHILLIPS, Chief Judge.

National Rolled Thread Die Company (National), the assignee of reissue Patent No. 26,518, brought this action against Colt Industries Operating Corp. (Colt) and several customers of Colt for infringement. Colt raised the affirmative defense that the reis-

sue patent was invalid and unenforceable. The District Court held the reissue claims in suit to be valid, but that National failed to meet its burden of establishing infringement by a preponderance of the evidence. We affirm.

### I.

The patent discloses self-pointing dies which are used in the production of gimlet point screws—a threaded sharp pointed screw. The patented dies consist of a moving die and a stationary die. The moving die reciprocates back and forth with cylindrical work blanks being fed into the thread rolling machine in a vertical plane past the stationary die. The headed cylindrical work blanks, which are fed between the dies at the start of the stroke, are turned into pointed screws by the complimentary interacting surfaces of the dies. The excess blank material comes off as a twisted slug.

"Old-fashioned" dies utilized pre-pointed blanks. These blanks were necessarily formed prior to the thread rolling process by manually reducing the blanks to the desired screw length and manually forming a point on the shortened blank. The self-pointing die, which the patent discloses, utilizes cylindrical blanks without the need for manually establishing a point before the thread rolling function is performed. The thread rolling function rolls the screw thread into the blank, rolls a threaded sharp point, and severs the blank at the desired screw length.

In 1954, Sterling Die Company (Sterling), a division of Colt, began marketing a self-pointing die, the 7399 die, which would not require pre-pointed blanks. Subsequently, Reed Rolled Thread Company (Reed) also introduced a self-pointing die, the BPT die.

National became aware of the development of self-pointing dies and commenced efforts to design such a die. National experimented with several variations of the self-pointing die and arrived at a viable design, the Style X die—represented by the patent-insuit.

On January 13, 1958, an application for patent, assigned to National, was filed on the Style X die and the patent issued on April 6, 1965 (No. 3,176,491). Subsequently, in light of negotiations with potential infringers, National was informed by Sterling and Reed that the 7399 and BPT dies were known and in public use before the patent filing date, and that they anticipated several claims of the patent. Consequently, National filed an application for a reissue patent on April 5, 1967, under 35 U.S.C. § 251 [1] in an attempt to obtain claims which distinguish over the purported prior art dies. During prosecution of the reissue application, the examiner requested samples of the purported prior art dies before the first office action. After several objections and rejections were made by the examiner, and amendments submitted by National, the reissue patent was granted on January 14, 1969. The Patent Office retained several of the old claims and allowed ten new claims.

On September 12, 1972, National filed suit against Colt and several indemnified customers of Colt alleging infringement of claims 18, 20, 29, 30, and 31 of its reissue patent by the use of the Sterling Cut-Off die.[2] Relying on the prior art status of the 7399 and BPT dies, Colt defended on the ground of invalidity by anticipation (35 U.S.C. § 102) and obviousness (35 U.S.C. § 103). Colt also contended that claims 18 and 20 were indefinite under 35 U.S.C. § 112. Moreover, Colt alleged that Nation-

1. 35 U.S.C. § 251 reads in part as follows:
 Reissue of defective patents
 Whenever any patent is, through error without any deceptive intention, deemed wholly or partly inoperative or invalid, by reason of a defective specification or drawing, or by reason of the patentee claiming more or less than he had a right to claim in the patent, the Commissioner shall, on the surrender of such patent and the payment of the fee required by law, reissue the patent for the invention disclosed in the original patent, and in accordance with a new and amended application, for the unexpired part of the term of the original patent. No new matter shall be introduced into the application for reissue.

2. The Sterling Cut-Off die was manufactured by Colt after the issuance of National's original patent, No. 3,176,491.

al deliberately concealed from the Patent Office the prior uses of "self-pointing" dies by Reed and Sterling. They argue that the patent should be unenforceable based upon fraud or "deceptive intention" under 35 U.S.C. § 251.

Although the District Court found the 7399 and BPT dies to be prior art, the court held the reissue patent to be neither anticipated by the prior art under 35 U.S.C. § 102 nor obvious in view of the prior art under 35 U.S.C. § 103. Furthermore, the court held that claims 18 and 20 satisfied the requirements of 35 U.S.C. § 112. The court held, however, that National failed to meet its burden of establishing infringement by Colt's use of the Sterling Cut-Off die. The patented die was found to have a mode of operation which differs from the operation of the accused die. The District Court failed to make any findings of unenforceability based upon fraud or "deceptive intention." This was considered to be unnecessary in view of the court's finding of non-infringement.

## II.

Colt argues that the District Court erred in finding the reissue patent to be valid. Colt makes what Chief Judge Howard T. Markey of the Court of Customs and Patent Appeals describes as a "shotgun" approach by raising practically every issue known to patent law having a bearing on validity. *Special Problems In Patent Cases,* 66 F.R.D. 529, 541 (1975). All of these contentions have been considered and found to be without merit.

The alleged primary errors as to validity are as follows: 1) the Court failed to consider the 7399 and BPT dies as "prior art" for purposes of establishing obviousness under 35 U.S.C. § 103; 2) the Court failed to make express factual findings of non-obvi-

ousness as required by *Hieger v. Ford Motor Co.,* 516 F.2d 1324 (6th Cir. 1975), *cert. denied,* 423 U.S. 1056, 96 S.Ct. 788, 46 L.Ed.2d 645 (1976); and, 3) the Court allowed the reissue patent a presumption of validity over the 7399 and BPT dies.

 Colt had a heavy burden of establishing the prior art status[3] of the *unpatented* 7399 and BPT dies by clear and convincing evidence, *Dickstein v. Seventy Corp.,* 522 F.2d 1294, 1296 (6th Cir. 1975), *cert. denied,* 423 U.S. 1055, 96 S.Ct. 787, 46 L.Ed.2d 644 (1976); *Dunlop Co. v. Kelsey Hayes Co.,* 484 F.2d 407, 412-13 (6th Cir. 1973), *cert. denied,* 415 U.S. 917, 94 S.Ct. 1414, 39 L.Ed.2d 471 (1974); *Cold Metal Products Co. v. E. W. Bliss Co.,* 285 F.2d 244, 247 (6th Cir. 1960); *United Parts Mfg. Co. v. Lee Motor Products, Inc.,* 266 F.2d 20, 24 (6th Cir. 1959). In view of the substantial evidence presented, we agree with the conclusion of the District Court that this burden was met. National argues that the 7399 and BPT dies cannot be considered prior art since they operated in an unsatisfactory manner; we have held, however, that an otherwise operative device can constitute prior art even if it has "imperfections and encounters commercial difficulties". *Dunlop, supra,* 484 F.2d at 413.

Notwithstanding the prior art status of the 7399 and BPT dies, Colt had the additional burden of establishing invalidity under either 35 U.S.C. § 102 (anticipation) or 35 U.S.C. § 103 (obviousness) in view of these prior art dies. The District Court's opinion indicates that both prior art dies were considered by the Court in arriving at its conclusion that Colt failed to meet its burden of establishing invalidity under either of these two sections. The court stated:

The principal defense in this action is that the patent in suit is *anticipated* by

**3.** "Prior art" under section 35 U.S.C. § 103 includes, but is not limited to, all statutory prior art material named in Section 102 which would be considered in determining novelty (i. e., anticipation) under the latter section. *See, Deep Welding, Inc. v. Sciaky,* 417 F.2d 1227, 1233 (7th Cir. 1969), *cert. denied,* 397 U.S. 1037, 90 S.Ct. 1354, 25 L.Ed.2d 648 (1970); *In re Harry,* 333 F.2d 920, 923 n. 2, 51 CCPA 1541 (1964). In the instant case, the District Court's conclusions indicate that the 7399 and BPT dies were publicly known (35 U.S.C. § 102(a)) before National's invention and publicly used more than one year before National filed the original patent application (35 U.S.C. § 102(b)).

the Sterling 7399 die, and *that the claimed invention was obvious in light of the 7399 die.* 35 U.S.C. § 102. To a lesser degree, the same arguments are based upon the Reed BPT die. (Emphasis added.)

Accordingly, we reject Colt's argument that neither the 7399 die nor the BPT die was considered by the District Court for purposes of establishing obviousness under 35 U.S.C. § 103.

 There can be no doubt that a District Court should make express factual findings when the question of obviousness is raised, before proceeding to the conclusions of law. *Graham v. John Deere Co.,* 383 U.S. 1, 17, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966); *Hieger, supra,* 516 F.2d at 1327. These findings should comprise the "scope and content of the prior art", the "differences between the prior art and the claims at issue", and the "level of ordinary skill in the pertinent art". *Id.* In the instant case, the District Court made several factual inquiries which meet the requirements of *Hieger.* Accordingly, we reject Colt's second argument.[4] The Court's findings are as follows:

1) the only pertinent prior art, whether patented or unpatented, is the 7399 and BPT dies; 2) the differences between the patented die and the prior art dies consist mainly in the Z angle and the point of separation of the slug and the forming screw; and, 3) the level of ordinary skill in the die design art embraces many fine points of design variation which produce material operational differences. We cannot say that these findings are clearly erroneous. We agree with the court's ultimate conclusion that these differences would be unobvious to a person skilled in the die design art.

Furthermore, we note several unobvious differences not expressly considered by the

court below: the patented die's blue flat taper surface has a distinctly different shape and outline from the gold surface on the 7399 die; the patented die is relieved in front of the black flat taper surface, whereas the comparable surface on the 7399 die is threaded and located at the same level as the yellow surface; the claims require serrations in the flat taper surface, whereas the 7399 die does not have serrations in that region; and, the patented die does not exert a material rupturing separation force to separate the reservoir from the partially formed point. These differences, including the Z angle and the point of separation, define a novel die which has the performance characteristics of no work hardening performed on the workpiece before it encounters the flat taper surface and maintaining intact the mass of material in the workpiece during the point forming cycle. Such characteristics assure the formation of a full screw point without unnecessary stress on the workpiece. The differences in design, moreover, are unobvious in the highly technical field of die design.

 A reissue patent is entitled to the same presumption of validity as that given to an original patent. *Hartzell Indus. v. McCauley Indus.,* 304 F.2d 481, 484 (6th Cir. 1962). Where the most pertinent prior art has been considered by the Patent Office, the presumption of validity is greatly strengthened. *Bolkcom v. Carborundum Co.,* 523 F.2d 492, 498 (6th Cir. 1975). Conversely, where pertinent prior art has not been considered by the Patent Office, the presumption is weakened. *Carborundum, supra,* 523 F.2d at 498; *Atlas Chemical Indus. v. Moraine,* 509 F.2d 1, 3 (6th Cir. 1974); *Tee-Pak Inc. v. St. Regis Co.,* 491 F.2d 1193, 1196 (6th Cir. 1974).

 Colt's third argument is that the presumption was weakened in this case since the Patent Office could do nothing

---

4. Not only is *Hieger* inapplicable because the Court, in the instant case, made express factual findings, but *Hieger* is also inapplicable since it involved a situation where the adjudication of validity was made on the "sole ground of the statutory presumption." 516 F.2d at 1327. In this case, however, the Court stated that its decision, based on expert testimony and the record, was merely "reinforced" by the Patent Office's consideration of the 7399 and BPT dies.

but ignore the 7399 and BPT dies; accordingly, it is contended that the court erred in relying on a presumption of validity over these dies. Colt's contention is that National merely informed the examiner that the submitted dies were "purported prior art" without conceding a prior art status. A concession of prior art, Colt argues, is necessary for a patentability examination in view of this art since the Patent Office has no procedural mechanism available to determine whether art is, in fact, prior art in an *ex parte* proceeding.

The District Court's determination, however, was primarily based upon the expert testimony and record before it and not upon the presumption of validity; the court stated that its decision was merely "reinforced" by the examiner's consideration of the dies. Notwithstanding, the Patent Office prosecution in the instant case indicates that a strong presumption of validity over the unpatented dies is warranted. Although we might agree that the Patent Office lacks the procedural tools to determine effectively the prior art status of an unpatented device in an *ex parte* prosecution,[5] the Office does, however, have the expertise to determine effectively if claims distinguish over certain art. The file history reveals that the Patent Office *assumed* the 7399 and BPT dies were, in fact, prior art and then proceeded to examine the application by determining if the claims distinguish over these dies.

The reissue application file indicates that the applicants wanted claims that were not "invalid by reason of . . . claiming more . . . than they had a right to claim in the [original] patent". They "wish[ed] to obtain a reissue patent with claims which distinguish over [the 7399 and BPT] dies". The application "revised a number of the claims, such as claims 1, 2, 25 and 26 to more clearly distinguish from the [7399 and BPT] dies". The Patent Office requested samples of these dies before examination of the application. In response

to the first office action, the applicants stated "that claims 27 to 36 round out the protection to which [they] are entitled and are needed in the event [the dies] are considered prior art".

Since applicants desired claims which distinguish over the 7399 and BPT dies, it was the examiner's obligation under the Patent Office rules to make a "complete [examination] as to all matters". 37 C.F.R. § 1.105 (1967). Such a thorough examination is also required with reissue applications. 37 C.F.R. § 1.176 (1967); Manual of Patent Examining Procedure (M.P.E.P.) § 1401.09. In view of the file history in the instant case, a "complete" examination would require allowance of the reissue claims only if they distinguish over the submitted art under the patentability standards of 35 U.S.C. § 102 and 35 U.S.C. § 103. Moreover, it was the examiner's obligation that all art cited by the applicants be fully considered by him. M.P.E.P. § 707.05(b). The Court of Customs and Patent Appeals has held that the submission of narrower claims in a reissue application, where prior art status is at issue, is a proper basis for filing a reissue case; the narrower claims "are simply a hedge against possible invalidity of the original claims should the prior use be proved". *Application of Handel*, 312 F.2d 943, 945 n. 2, 50 CCPA 918 (1963). This language presupposes that the Patent Office has considered the narrower claims to determine if they distinguish over the questionable prior art.

Colt has made several additional arguments relating to intervening rights, fraud, "deceptive intention", and attorney fees. In view of our affirmance of the District Court's finding of non-infringement in Part III of this opinion, we find it unnecessary to consider the questions of intervening rights and fraud. The defense of fraud in patent litigation involves the reluctance of a court of equity to *enforce* an otherwise valid patent where the patentee

**5.** Nevertheless, the Court of Customs and Patent Appeals has placed the burden of proving prior art status on the examiner and not on the applicant in an *ex parte* proceeding. *See, Application of Bass*, 474 F.2d 1276, 1287, 59 CCPA 1342 (1973). We expressly reserve a decision, however, as to the weight we will grant such an *ex parte* prior art determination.

has behaved unethically in his dealings with the Patent Office. *See, Buzzelli v. Minnesota Mining Co.,* 521 F.2d 1162, 1166 (6th Cir. 1975). It does not result in *invalidity* of an otherwise valid patent. Since there is no infringement, there is no need to enforce the patent; consequently, there is no need to consider the question of nonenforcement based on fraud.

The issue of "deceptive intention", however, is a material question upon which Congress has expressly provided for the denial to an applicant of the benefit of a reissue application. An applicant is entitled to file a reissue application under 35 U.S.C. § 251 only when the original patent is "wholly or partly inoperative or invalid" through "error without deceptive intention". Therefore, if a reissue patent issues where the applicant had "deceptive intention", the patent is not merely unenforceable, it is invalid.

Although the District Court failed to make any express findings as to "deceptive intention", we believe the facts are insufficient to establish such conduct. As in the case of fraud, *Schnadig Corp. v. Gaines Manf. Co.,* 494 F.2d 383, 392 (6th Cir. 1974), proof of "deceptive intention" must be established by clear, unequivocal and convincing evidence. Examination of the record convinces us that Colt has failed to meet this burden.

Finally, we do not deem this case to be "exceptional" under 35 U.S.C. § 285 to warrant the award of attorney fees.

### III.

National argues that the District Court erred by relying upon mode of operation in determining non-infringement. It is contended that infringement is clearly established since the claims literally read on the accused die. In *Nickerson v. Bearfoot Sole Co.,* 311 F.2d 858 (6th Cir. 1962), *cert. denied,* 375 U.S. 815, 84 S.Ct. 48, 11 L.Ed.2d 50 (1963), this Court stated:

> In order to infringe a patent, a device or machine must not only perform the same, or substantially the same, function or accomplish the same result as the patented invention, but it must also perform the function or accomplish the result by identical, or substantially identical, or equivalent means. Conversely, a machine or device which performs the same function or accomplishes the same result by substantially different means, or by a substantially different principle or mode of operation, or in a substantially different way, does not infringe the patented invention. *Swan Carburetor Co. v. Chrysler Corp.,* 130 F.2d 391 (C.C.A. 6); *Flowers v. Austin-Western Co.,* 149 F.2d 955 (C.C.A. 7); *Montgomery Ward & Co. v. Clair,* 123 F.2d 878 (C.C.A. 8); *Wheat v. Ford Motor Co.,* 118 F.2d 612 (C.C.A. 8); *Holtzer-Cabot Electric Co. v. Standard Electric Time Co.,* 111 F.2d 71 (C.C.A. 1); *Shakespeare Co. v. Perrine Mfg. Co.,* 91 F.2d 199 (C.C.A. 8).

\* \* \* \* \* \*

> "An abundance of authority sustains the point *that a defendant's device may be within the language of a claim and not be in infringement; that an infringement is not a mere matter of words. General Electric Co. v. Allis-Chalmers Co.,* 178 F. 273, 276 (3 C.C.A.); *Id.* (C.C.) [*General Electric Co. v. Allis-Chalmers Co.*] 171 F. 666, 669, citing *Westinghouse v. Boyden* [*Power-Brake Co.*], 170 U.S. 537, 18 S.Ct. 707, 42 L.Ed. 1136." *Henderson v. Welch Dry Kiln Co.,* 5 Cir., 26 F.2d 810, 814.

> "We note that appellant contends that the claims of the patent in suit read upon appellee's device. We may assume that this is true, \* \* \*. But infringement is not a mere matter of words. *Henderson v. Welch Dry Kiln Co.,* D.C., 26 F.2d 810, 814; *Goodyear Shoe Mach. Co. v. Spaulding,* C.C., 101 F. 990, 994; *Linde Air Products Co. v. Morse Dry Dock & Repair Co.,* 2 Cir., 246 F. 834, 838; *Bird v. Elaborated Roofing Co. of Buffalo,* 2 Cir., 256 F. 366, 373. Here, we hold that the mode of operation is different and that there is no equivalency of means." *Grant v. Koppl,* 99 F.2d 106, 110 (C.C.A. 9).

\* \* \* \* \* \*

"Infringement should not be determined by a mere decision that the terms of a claim of a valid patent are applicable to the defendant's device. Two things are not necessarily similar in a practical sense because the same words are applicable to each. *The question of infringement involves considerations of practical utility and of substantial identity, and therefore must be quantitative, as well as qualitative.*" *Goodyear Shoe Mach. Co. v. Spaulding,* 101 F. 990, 994.

"There is no magic in a name, nor in a claim; that the words preferred by a patentee to define his invention apply literally to another's device suggests, but does not prove, infringement; *there must be a substantial identity, to justify that conclusion of law. Edison v. American [Mutoscope & Biograph] Co.* [2 Cir.], 151 F. 767." *Linde Air Products Co. v. Morse Dry Dock & Repair Co.,* 246 F. 834, 838 (C.C.A. 2). *Id.* at 879–881. (emphasis added).

*See also Graver Mfg. Co. v. Linde Co.,* 399 U.S. 605, 608, 70 S.Ct. 854, 94 L.Ed. 1097 (1950); *Cardinal of Adrian v. Peerless Wood Prod. Inc.,* 515 F.2d 534, 540 (6th Cir. 1975); *Olympic Fastening Systems, Inc. v. Textron Inc.,* 504 F.2d 609, 616 (6th Cir. 1974), *cert. denied,* 420 U.S. 1004, 95 S.Ct. 1447, 43 L.Ed.2d 762 (1975); *Remington Rand Inc. v. Meilink Co.,* 140 F.2d 519, 521 (6th Cir. 1944).

The findings of the District Court as to non-infringement are not clearly erroneous. National has not met its burden of establishing identity as to mode of operation.

 National argues that mode of operation is irrelevant where form is the essence of the invention. National relies on *Union Paper Bag Co. v. Murphy,* 97 U.S. 120, 24 L.Ed. 935 (1878). In *Murphy,* the Supreme Court said:

*Except where form is of the essence of the invention, it has but little weight* in the decision of such an issue, the correct rule being that, in determining the question of infringement, the court or jury, as the case may be, are not to judge about similarities or differences by the names of things, but are to look at the machines or their several devices or elements in the light of what they do, or what office or function they perform, and how they perform it, and to find that one thing is substantially the same as another, if it performs substantially the same function in substantially the same way to obtain the same result, always bearing in mind that devices in a patented machine are different in the sense of the patent law when they perform different functions or in a different way, or produce a substantially different result. *Id.* at 125. (emphasis added)

*See also Sanitary Refrigerator Co. v. Winters,* 280 U.S. 30, 42, 50 S.Ct. 9, 74 L.Ed. 147 (1929); *Bardes Range Co. v. American Engineering Co.,* 109 F.2d 696, 698 (6th Cir. 1940). Although we might agree that form has *added* weight where it is the essence of the invention, we cannot say that mode of operation is an irrelevant consideration. Mode of operation is always a relevant consideration where the patented device has some operational characteristics. Notwithstanding the novel form or shape of the patented dies, the essence of the invention is in the operational characteristics of the dies and their interaction with the workpiece. The District Court therefore, did not err in considering the mode of operation of the patented dies.

Accordingly, the decision of the District Court is affirmed.

No costs are taxed. Each party will bear its own costs on this appeal.